THE CITY OF GREENSBORO v. J. A. HODGIN, County Treasurer, and THE BOARD OF EDUCATION OF GUILFORD COUNTY.

*Constitution — Distribution of County School Fund — Charter of Greensboro — Graded Schools.*

1. The public school fund in any county, from whatever source arising, must be distributed *pro rata* among the several school districts, respectively, according to the number of children in each.

2. The following provision in the charter of the city of Greensboro, "All taxes now paid, or which hereafter may be paid, by the citizens of the city of Greensboro for State and county school purposes shall be paid by the County Treasurer to the Treasurer of the city of Greensboro, and, by him, applied to the graded schools of the city as provided by law," is unconstitutional and void.

3. The Legislature may provide that the portion of the school fund going to any school district may be devoted to the support of "graded schools" in such district, but such "graded schools" must be subject to the public school authorities to the extent of enabling them at all times to see that proper school advantages are extended to every child entitled to attend the public school in such district.

This was a Controversy, submitted without action, and heard before *Armfield, J.,* at February Term, 1890, of the Superior Court of GUILFORD County.

The facts agreed were as follows:

1. The county of Guilford is divided into school districts, ninety-five for white children and thirty-eight for colored children within six and twenty-one years of age, including two districts in the city of Greensboro, one for white children and one for colored children.

2. The number of school subjects, male and female, white and colored, in the whole county, including the city, as shown by the census of November, 1889, is 9,577, and of this number 6,519 are white children and 3,058 are colored children.

3. In the two districts aforesaid, within the corporate limits of the city of Greensboro, there are 738 school subjects, and of these 465 are whites and 237 are colored.

4. The total amount of the school fund, for the whole county, from all sources (there being none from the State Treasury), deducting for insolvents, Sheriff's five per cent. commissions and County Treasurer's two per cent. commissions, is $15,500, as near as can be estimated, and this sum being reduced by $700 for salary of Superintendent and other necessary expenses, leaves the net sum of $14,800 for apportionment among the districts.

5. This sum of $14,800, divided among the school subjects in the whole county, to-wit, among 9,577 children, gives $1.54 to each child.

6. Of said sum of $14,800, there is raised from the city of Greensboro school funds as follows:

| | |
|---|---:|
| 15 cents on $100 of property listed for taxation ($1,264,524) ___$ | 1,896.78 |
| Polls, 325 at $1.91 _____ | 620.66 |
| Total of property and poll taxes _____$ | 2,517.44 |
| Add for bar-rooms, $80 each for five bars_____ | 400.00 |
| In all from the city of Greensboro _____$ | 2,917.44 |

7. In the new charter of the city of Greensboro, passed at session of 1888–'89, section 78, and ratified 11th of March, 1889, there is this clause: "All taxes now paid, or which hereafter may be paid by the citizens of city of Greensboro, for State and county school purposes, shall be paid by the County Treasurer to the Treasurer of the city of Greensboro, and by him applied to the graded schools of the city, as provided by law."

8. The city of Greensboro, under said section of said charter, claims to be entitled to the whole of said sum of $2,917.44 paid by the citizens of the city.

9. Deducting said sum of $2,917.44, as claimed by the city, from the $14,800, the net amount for the whole county, we have $11,882.36 for apportionment among, or on account of the children outside of the city, to-wit, 8,839, and that gives them $1.34 *per capita*, and the sum of $2,917.44, if separated and paid over to the city, as the city claims shall be done, apportioned or divided among the school subjects resident in the city, will give $3.95 *per capita* to them.

10. The city of Greensboro has demanded of defendant Hodgin, County Treasurer, to pay over to the City Treasurer the said sum of $2,917.44, raised from its citizens, and said Hodgin has refused to pay over the same for want of any appropriation beyond the sum of $984, which he has paid, or is ready and willing to pay.

11. The Board of Education for the County of Guilford has appropriated and ordered to be paid over to the districts, or for the districts, in the city of Greensboro, the sum of $984, in the same proportion to all the other districts in the county, and as to the residue of the school funds raised from the citizens of Greensboro, it has refused to appropriate or order its payment to the City Treasurer upon the belief, in good faith entertained, that the clause in the charter above set forth is in violation of the Constitution of the State, and contrary to the laws governing the public school system, but holds unappropriated an estimated amount to satisfy the city's demand, if, upon the facts herein, it is so adjudged by this Court.

Upon the foregoing facts the city prays judgment that it recover judgment for the sum raised by its citizens towards the school fund for 1889, less the $984, which has already been appropriated to it, and the defendants pray judgment that the clause of the city's charter, under which the city claims, be held unconstitutional and inoperative, and the Board of Education be adjudged to go on and apportion the fund, left in hand to await the decision of the Court, among

all the districts in the county as directed under the Constitution and general school law ef the State.

The Court gave judgment as follows:

"1. That section 78 of the charter of plaintiff, enacted by the General Assembly at its session of 1888, ratified 11th March, 1889, the same as mentioned in the case agreeed, is constitutional.

"2. That the taxes to be paid over to the treasurer of the plaintiff by virtue of said section, are the taxes levied on property and poll, and do not include the tax on license to sell spirituous and malt liquors.

"3. That the defendants set apart and pay to the treasurer of the plaintiff all taxes paid by the citizens of the city of Greensboro on property and poll levied for State and county school purposes, to-wit, the sum of $2,517.44.

"4. That plaintiff recover of defendants the costs of this controversy without action."

From this judgment the plaintiff appealed, assigning as error that the Court construed "the 78th section of the city charter so as to not include the taxes paid for liquor license in the amount which should be paid to the City Treasurer." The plaintiff appealed in open Court, and assigns for error such construction of the statute and refusal to give judgment for the whole amount claimed.

The defendant also appealed, assigning as error that the Court "adjudges the 78th section of the plaintiff's charter constitutional, and directs defendant to set apart and pay to the treasurer of plaintiff the taxes paid by the citizens of Greensboro on property and poll levied for State and county school purposes."

*Mr. J. T. Morehead* (by brief), for plaintiff.
*Messrs. Dillard & King* (by brief), for defendant.

MERRIMON, C. J.: The organic law of this State requires and provides for the free education of the people. The 9th

article of the Constitution is devoted exclusively to the sub-
ject of education.    It declares its prime importance, and that
it shall "forever be encouraged."    The second section of that
article provides that "the General Assembly, at its first ses-
sion under this Constitution, shall provide, by taxation and
otherwise, for a general and uniform system of public schools,
wherein tuition shall be free of charge to all children of the
State between the ages of six and twenty-one years."    Thus,
the Legislature is required to promote popular education by
devising and establishing a plan—a scheme—consisting of
necessary and well-appointed constituent parts, and the whole
organized into a complete system of public schools.    Such sys-
tem must be general—not local—not limited to one or more
places or localities in the State; it must extend and prevail
throughout its borders; and so, also, it must be uniform in
all material respects as contemplated by the Constitution—
that is, the system cannot be so regulated by statute as that
it will apply and operate as a whole in some places, localities
and sections of the State, and not in the same, but in differ-
ent ways, in other places, localities and sections.    An essen-
tial requirement of the provision above recited is that the
system, whatever it may be, in whatever manner constituted,
must be general and uniform as a whole, and therefore so
in all its material parts, the purpose being to extend to all
the children within the prescribed ages, wherever they may
reside in the State, the same opportunity to obtain the bene-
fits of education in free public schools—certainly to the
extent that the State itself shall supply means to support
such schools.    The provision declares that tuition in such
schools "shall be free of charge to all the children of the
State between the ages of six and twenty-one years"—not to
one child more or less than another, nor to children in one
place or locality more than another.

The fourth section of the article cited above prescribes
what property and funds of the State shall be devoted to

the support of such schools, and it declares that the same "shall be faithfully appropriated for establishing and maintaining in this State a system of free public schools, and for no other uses or purposes whatsoever." Obviously, this clause has reference to the general and uniform system of public schools referred to above. The means so provided, and required to be provided, are to be faithfully appropriated and devoted to the support of such system of schools—not in one place or locality more or less than another, but in all places in and throughout the State in like manner and just and equal proportion.

A very material part of the fund thus devoted to the support of public schools is taken from the ordinary revenue of the State, raised by taxation, but this does not imply, nor does it follow, that the fund thus raised is to be distributed to the support of schools located in the neighborhood of those tax-payers who paid the taxes, or most, thereof, but it is to be distributed as nearly as may be *per capita* for the education of all the children in the State, as prescribed, without regard to who paid the taxes, or the locality from which the fund, or most of it, came. The State supports the system of schools out of certain of its specified resources, and its ordinary revenue to a large extent, and without charge to those who send their children to such schools, and this is a chief purpose of the system. It is deemed essential by the State and the people, and they have declared in their organic law that all the children of the State, as prescribed, rich and poor alike, shall have free opportunity to share in the benefits of such schools without charge, and there appears a clear purpose to extend such benefits equally to all—every one—without distinction as to individuals or localities.

· But the funds necessary for the support of public schools — the public school system—are not derived exclusively from the State. The Constitution plainly contemplates and

intends that the several counties, as such, shall bear a material part of the burden of supplying such funds. Section 3 of the article cited, provides that, "Each county of the State shall be divided into a convenient number of districts, in which one or more public schools shall be located four months in every year; and if the commissioners of any county shall fail to comply with the aforesaid requirements of this section, they shall be liable to indictment." The duty thus imposed upon the county commissioners is peremptory, and it is intended that they shall discharge it, and they fail to do so at their serious peril. But how can they maintain such schools without means to do so? The necessary inference is that the Legislature shall invest the proper county authorities with power to levy taxes in their respective counties for the support of such schools. Otherwise, the provision just recited would be meaningless and practically nugatory.

That the Constitution intends that each county, as such, shall have permanent constituent connection with the public school system, and join in the support of such schools within its bounds, appears further in that the fifth section of the article thereof cited, prescribes and defines what property and resources of the several counties shall constitute the " *County School Fund*," and it declares and requires that such fund " shall belong *to and remain in* the several counties, and shall be faithfully appropriated for establishing and maintaining free public schools in the several counties of this State: *Provided*, That the amount collected in each county shall be annually reported to the Superintendent of Public Instruction." It seems that the settled purpose in making the counties of the State severally constituent parts of the public school system is to give it additional strength and greater local efficiency. It facilitates in some measure the distribution of taxes paid for the support of such schools in the counties where they were levied, and

this, it seems, is not deemed unreasonable or unjust. But, whatever the motive, the provision and purpose appear.

As we have seen, the general school fund of the State is distributed to each county in proportion to the number of children in each within the age prescribed. The county school fund must be disbursed in the county to which it belongs, and in addition to that supplied by the State. The clause of the section last above recited provides that the county school fund "shall belong to and remain in the several counties." It would be idle to bear the burden of the inconvenience and expense of a county school fund, if it is to be considered and treated as a part of the general public school fund of the State. In that case the funds that make up the county school fund might as well be paid into the State treasury at once. We may add that the Legislature has uniformly interpreted the clause last mentioned as we have done. We do not doubt the correctness of our interpretation of it.

We think, also, that the Constitution intends and requires that the State and county school funds shall be distributed to the several school districts in the county in such way as to extend to all the children thereof, as nearly as practicable, equal school opportunities and advantages, and as to make the school term or terms in each district in every year, as nearly as may be, equal with the same of every other district in the county. This is necessary to just equality. Indeed, to this end, Article 9, section 3, requires that, " Each county of the State shall be divided into a convenient number of districts, in which one or more public schools shall be maintained at least *four months* in every year." This provision is very important and should be very scrupulously observed. It is thus the school funds, from whatever source they come, reach the beneficiaries.

As we have seen, the public school fund of the State must be distributed to the several counties in proportion to the

number of school children in each.   It is likewise required
that the funds supplied by the counties shall supplement
that of the State, and be distributed in the counties supply-
ing the same, as pointed out above.   The Constitution as
certainly applies and directs the distribution of the public
school funds of the different counties within the county sup-
plying the same, as that of the State, for the like considera-
tions and substantially in the same terms.   Such county
fund is, by the Constitution, devoted to the support of the
"general and uniform system of public schools" in the
county to which it belongs, and hence the Legislature has
no power to divert it, or any part thereof, from its applica-
tion as above explained; nor has it power to divert the State
fund appropriated to the support of such schools, from its
application as indicated above.

Some question has been made as to whether or not the Leg-
islature has power to provide by statute that parts of the State
and county public school funds shall be appropriated to the
support of "Graded Schools," organized as allowed by law.

While the Legislature has power to devise and establish
a general and uniform system of public schools, and to
amend or modify the existing system, consistently with the
Constitution, it certainly cannot provide for and establish
particular kinds of schools in particular cities, towns and
localities, that offered greater or less advantage than the
public schools, to the disadvantage or detriment of the lat-
ter in any respect.   We think, however, that where "Graded
Schools" are, or may be, established in regular school dis-
tricts, with the sanction of law, and they are required to
afford to the children therein substantially the same school
opportunities and advantages as do the ordinary public
schools, the Legislature can provide by statute that the por-
tion of the public school funds, county and State, going to
such school districts respectively, shall be devoted to the
support of such "Graded Schools" in the school district

where they respectively exist. But such "Graded Schools" must be made subject to the public school authorities, certainly to the extent of enabling them freely and at all times to see that proper school advantages in every respect are extended to every child entitled to attend the public school in the school district where the "Graded School" is located. The latter must fully supply the place of the public school, whatever additional and larger advantages it may afford.

For the reasons stated above, we are clearly of opinion that section 78 of the statute (Private Acts, 1889, ch. 219), which recites that "all taxes now paid, or which hereafter may be paid by the citizens of the city of Greensboro, for State and county school purposes, shall be paid by the County Treasurer to the Treasurer of the city of Greensboro, and by him applied to the Graded Schools of the city as provided by law," is repugnant to the constitutional provisions cited above, and, therefore, void, and we so declare.

It follows that so much of the judgment as the plaintiff appealed from must be affirmed, and so much thereof as defendants appealed from must be reversed, and judgment entered for the defendants in the Court below. To that end let this opinion be certified to the Superior Court.

Judgment affirmed in part and reversed in part.