### A. T. PERRY AND WIFE, JESSIE PERRY, v. C. F. STANCIL.

(Filed 8 April, 1953.)

**1. Constitutional Law § 4—**

Questions of constitutional construction are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments.

**2. Same—**

In construing a constitutional provision, the prime purpose of the established canons of judicial construction is to give effect to the intent of its framers and the people adopting it.

**3. Same—**

A literal meaning will not be accorded words of a constitutional provision when to do so would contravene the dominant purpose or intent clearly apparent when the words are read in context.

**4. Constitutional Law § 6—**

An amendment to the Constitution must be construed to ascertain the intent, and to this end the courts must consider the conditions as they existed at the time of its adoption and the purpose sought to be accomplished or the remedy sought to be provided.

**5. Husband and Wife § 12c—**

The limitation of Art. X, sec. 6, of the Constitution that the conveyance by a married woman of her separate estate must be with the written assent of her husband applies to conveyances executed by her to third parties, but does not apply to a conveyance executed by her to her husband.

APPEAL by defendant from *Bone, J.,* at Chambers, 19 December, 1952, MARTIN. Affirmed.

Controversy without action to adjudicate the rights of the respective parties under a contract to convey real property.

Maggie Perry was, on 11 November 1942, the wife of A. T. Perry. On that day she executed a deed conveying, or purporting to convey a $\frac{6}{7}$ undivided interest in a tract of land which was a part of her separate estate to her said husband. He owned the other $\frac{1}{7}$ interest. She alone signed the deed and the husband did not assent thereto in writing. He did, as grantee, accept the deed and thereafter, with joinder of his said wife, convey the larger part of the land described in the deed to third parties. The due execution of the deed was acknowledged by Maggie Perry, and the notary public taking the acknowledgment made the certificate required by G.S. 52-12.

Maggie Perry died on or about 9 July 1950, and on 10 November 1952, A. T. Perry and his present wife contracted to convey to defendant the *locus* which is a part of the land described in the deed from Maggie Perry

to A. T. Perry. Defendant declined to accept deed therefor and pay the agreed purchase price for the asserted reason that plaintiffs cannot convey a marketable fee simple title to said premises as they had contracted to do.

Thereupon the parties agreed upon the facts and instituted this proceeding to have the court judicially determine the question. The court below, being of the opinion the deed from Maggie Perry to A. T. Perry conveyed "a fee simple, merchantable, indefeasible title" to the land described therein, entered judgment decreeing specific performance of the contract to convey. Defendant excepted and appealed.

*Clarence W. Griffin and Wheeler Martin for plaintiff appellees.*
*Charles H. Manning for defendant appellant.*

BARNHILL, J. The framers of the Constitution of 1868 inserted therein the following provision:

"The real and personal property of any female in this State, acquired before marriage, and all property, real and personal, to which she may, after marriage, become in any manner entitled, shall be and remain the sole and separate estate and property of such female, and shall not be liable for any debts, obligations or engagements of her husband, and may be devised and bequeathed, and, with the written assent of her husband, conveyed by her as if she were unmarried." Constitution of 1868, Art. X, sec. 6.

The controversy between the parties to this action arises out of conflicting contentions respecting the meaning of that part of this section of the Constitution which permits a married woman "with the written assent of her husband" to convey her real property "as if she were unmarried" and presents this question for decision: Does this limitation upon the right of a married woman to convey real property apply to a deed from a wife to her husband; in other words, is a deed executed by a married woman without the written assent of her husband, conveying real property which is a part of her separate estate, to her husband void for want of his written assent?

Defendants argue that this limitation upon the right of a married woman to convey her property is simply expressed in clear and unambiguous language; that it does not contain any exception or any language susceptible of the interpretation that an exception was intended or that it is less comprehensive in scope than it, upon its face, appears to be. They stressfully contend, therefore, that there is no room for construction and no justiciable question is presented.

But "few words are so plain that the context or the occasion is without capacity to enlarge or narrow their extension." Crawford, Stat. Constr., 276, sec. 174; *Watson Industries v. Shaw, Comr. of Revenue,* 235 N.C.

203, 69 S.E. 2d 505; "An inhibition or prohibition usually extends no farther than the reason on which it is founded. *Cessante ratione, cessat ipsa lex." In re Yelton:* Advisory Opinion, 223 N.C. 845, 28 S.E. 2d 567.

We must, therefore, examine the language used in the light of well recognized and established canons of judicial construction to ascertain whether it is less comprehensive in meaning and effect than it appears to be.

Questions of constitutional construction are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments, 11 A.J. 658, and "the fundamental principle of constitutional construction is to give effect to the intent of the framers of the organic law and of the people adopting it," 11 A.J. 674. The heart of the law is the intention of the lawmaking body. *Trust Co. v. Hood, Comr. of Banks,* 206 N.C. 268, 173 S.E. 601; *Supply Co. v. Maxwell, Comr. of Revenue,* 212 N.C. 624, 194 S.E. 117; *S. v. Emery,* 224 N.C. 581, 31 S.E. 2d 858. And in arriving at the intent, we are not required to accord the language used an unnecessarily literal meaning. Greater regard is to be given to the dominant purpose than to the use of any particular words, *Trust Co. v. Waddell,* 234 N.C. 454, 67 S.E. 2d 651; *Trust Co. v. Schneider,* 235 N.C. 446, 70 S.E. 2d 578, for "the letter of the law is its body; the spirit, its soul; and the construction of the former should never be so rigid and technical as to destroy the latter." *Machinery Company v. Sellers,* 197 N.C. 30, 147 S.E. 674; *Dyer v. Dyer,* 212 N.C. 620, 194 S.E. 278; *Opinions of the Justices,* 204 N.C. 806, 172 S.E. 474. "The letter killeth, but the spirit giveth life."

Constitutional provisions should be construed in consonance with the objects and purposes in contemplation at the time of their adoption. To ascertain the intent of those by whom the language was used, we must consider the conditions as they then existed and the purpose sought to be accomplished. Inquiry should be directed to the old law, the mischief, and the remedy. The court should place itself as nearly as possible in the position of the men who framed the instrument. 11 A.J. 675; *Ex parte Bain,* 121 U.S. 1, 30 L. Ed. 849.

A court should look to the history, general spirit of the times, and the prior and the then existing law in respect of the subject matter of the constitutional provision under consideration, to determine the extent and nature of the remedy sought to be provided. 11 A.J. 676; *Missouri v. Illinois,* 180 U.S. 208, 45 L. Ed. 497; *Maynard v. Board of Canvassers,* 47 N.W. 756; *S. v. Kees,* 114 S.E. 617.

Applying these general principles here, it is apparent that to determine the nature and extent of the remedy the framers of the Constitution sought to provide in adopting Art. X, sec. 6, of the Constitution, we must examine briefly the history of the law respecting the rights of a married

woman and the prior concept of her capacity to transact business relating to her separate estate. Only thus may we ascertain the intent and purpose of the section. It was intended to remedy some prevailing condition or protect some existing right. What that condition or right was depends upon the then status of a married woman respecting her separate estate, and the prevailing concept of the people as to her capacity to engage in business transactions with particular respect to her capacity to convey real property.

At common law the personal property of a woman, upon her marriage, vested absolutely in the husband. *O'Connor v. Harris,* 81 N.C. 279; *Arrington v. Yarbrough,* 54 N.C. 72. Likewise, upon marriage, the husband at once became seized of an estate in the land of his wife during coverture which gave him the right of possession and control. He could appropriate all the rents and profits to his own use and could sell and convey the land for a period not exceeding the coverture. Upon the birth of issue capable of inheriting the wife's land, his estate was enlarged so that he immediately became the owner for the period of his natural life and he could convey his life estate therein without the joinder of his wife. *Taylor v. Taylor,* 112 N.C. 134; *Richardson v. Richardson,* 150 N.C. 549, 64 S.E. 510. The personal estate of the wife as well as his interest in her real property was subject to levy under execution to satisfy his debts. 1 Mordecai's Law Lectures, 2d Ed. 291; Anno. 133 A.L.R. 634-5.

On the other hand, while the wife retained the fee, she could not convey it during coverture even with the husband's consent, except by a fine. 1 Mordecai's Law Lectures, 2d Ed., 291; 1 Powell on Real Property, 430; 3 Vernier, Amer. Family Laws, 293. And a deed from the wife to the husband was void. *Sims v. Ray,* 96 N.C. 87; *Sydnor v. Boyd,* 119 N.C. 481. The fiction of the unity of husband and wife rendered all contracts between them a nullity. Furthermore, the people of that day entertained the fiction that the husband was the dominant member of the household and any transaction between the two affecting her property was had at his dictation, and the law presumed that contracts between them affecting her real estate were executed under his coercive influence. Consequently, any instrument executed by her was without force or effect.

In the early days of our history these common law rules prevailed in North Carolina. However, as our civilization has progressed, the limitations thus placed upon the property rights of a married woman have been gradually but surely removed. *Houston v. Brown,* 52 N.C. 161; *Wilson v. Arentz,* 70 N.C. 670; *Morris v. Morris,* 94 N.C. 613.

In 1837 the General Assembly adopted enabling statutes which modified the common law rules in three respects:

(1) It provided that a conveyance of the land of the wife should be jointly executed and acknowledged by the husband and wife, and the wife

should be privily examined as to her voluntary assent thereto, and that such conveyances should be "valid in law" to convey her interest in the land therein described "whether in fee simple, right of dower or other estate, as if done by fine and recovery, or any other means or ways whatsoever." 1 Rev. Stat. 1836-7, ch. 37, sec. 9; Rev. Code 1854, ch. 37, sec. 8.

(2) It vested the wife with the right to have and retain property acquired by her *after the rendition of a decree of divorce a mensa,* and provided that said property "shall not be liable to the power, dominion, control, or debts of her husband . . ." Rev. Stat., ch. 39, sec. 11; Rev. Code 1854, ch. 39, sec. 13. This section likewise vested her with the right, after a decree of divorce *a mensa,* to sue and be sued without joining her husband and made her liable "upon contracts and injuries thereafter made and done, as though she were a *feme* sole."

(3) It withdrew from the husband the right to lease the lands of his wife for a term of years or for life without the joinder of the wife, "she being thereto privily examined," or to alien the rents longer than during the coverture. 1 Rev. Stat., ch. 43, sec. 9.

It is to be noted that these statutes made no change in the law respecting the right of the husband in the personal property of the wife which she owned at the time of her marriage or acquired during coverture, but before the date of a decree of divorce *a mensa,* or in his right to the rents and profits derived from her real estate.

In 1848 the Legislature enacted another statute similar in content to 1 Rev. Stat., ch. 43, sec. 9, but which went even further in removing the common law rights of a husband in the property of his wife. This Act, ch. XLI, Laws 1848-9, after providing that the land of a married woman shall not be leased by the husband for the term of his own life or any less term of years "except by and with the consent of his wife . . . to be ascertained and effectuated by privy examination . . ." prohibits the sale under execution against the husband of any interest he may possess in the lands of his wife. Rev. Code 1854, ch. 56, sec. 1; ch. 37, secs. 8 and 11; *Houston v. Brown, supra.*

So then, it appears that when the constitutional convention of 1868 came to consider what provisions, if any, should be incorporated in the fundamental law for the protection of property rights of married women, the General Assembly had (1) modified the common law rule so as to deprive the husband of the power to convey the lands of his wife for the term of his life "or any less term of years" without the voluntary joinder of his wife, the voluntariness of her consent to be evidenced by her privy examination; and (2) freed her land and the rents and profits therefrom of any claim of his creditors. But the concept that a married woman was incapable of engaging in business transactions with her husband by reason of his dominant influence over her and that any deed she might exe-

cute conveying property to him was executed under his coercion and therefore void still prevailed and was enforced as a part of the law of the land. *Walker v. Long,* 109 N.C. 510.

These are circumstances or conditions which existed at the time. They must be accorded prime consideration when we come to construe the language used. Indeed they, in effect, control decision here.

Although the language, literally construed, is sufficiently comprehensive to include a conveyance from a married woman to her husband, to so hold would require us to (1) assume the framers of the Constitution intended to invalidate and repeal a presumption which had been recognized and enforced since the earliest days of English history, (2) do violence to the then legal presumption that a married woman was incapable of dealing voluntarily and at arm's length with her husband respecting her real estate, (3) write into the section by judicial construction an intent to validate transactions then deemed to be void, and (4) accord the language a meaning that is, under the circumstances, contrary to logic and common sense. Obviously, to require the husband to join in the execution of a deed to him from his wife and thus become both grantor and grantee, when his acceptance of the deed and the benefits accruing to him thereunder is the best evidence of his assent, is but to require an act without sense or reason.

In the absence of an express provision to that effect, we should be slow in adopting the conclusion that it was the intention of the framers of the Constitution to enact so radical a change in the law; because if such was the intention, it is reasonable to presume it would have been declared in direct terms and not be left as a matter of inference. *Roberts v. Manufacturing Co.,* 169 N.C. 27, 85 S.E. 45.

It is true Art. X, sec. 6, did work a radical change in the rights of a married woman respecting her personal estate, but the intent so to do is expressed in clear and unambiguous language. The language used fails to disclose clearly a like intent in respect to her right to make a contract with her husband affecting her separate real estate.

In this connection we must bear in mind that the presumption a wife is subject to the coercive influence of her husband, even as to conveyances to third parties, persisted in this State until 1945. The privy examination of the wife was devised as a method of rebutting this presumption, and a deed or other instrument executed and acknowledged by her without her privy examination was void. *Richardson v. Richardson, supra.* And this requirement that the wife be privily examined by the person taking her acknowledgment was not repealed until 1945. Ch. 73, Session Laws 1945.

Contrariwise, if we construe the language to relate only to conveyances to third parties, then it meets the test of logic and reason, requires no vain

or useless act, and accords with the concepts of the people of that day and the law as it then existed.

We conclude, therefore, that the limitation upon the right of a married woman to convey her real property, contained in Art. X, sec. 6, of the Constitution, applies only to conveyances executed by her to third parties, that is, persons other than her husband.

The conclusion that this was the intent of those who wrote and adopted Art. X, sec. 6, of the Constitution is fortified and confirmed by later action of the General Assembly in the same era.

In 1871, having authorized a conveyance of land by a married woman "with the written assent of her husband," the General Assembly set about the business of devising a method of rebutting the presumption that the wife, when dealing with her husband, always acted under his coercive influence and thereby granting a married woman the right to contract with her husband. As a result, ch. 193, P.L. 1871-2 (now G.S. 52-12) was adopted. This act was designed to give validity to transactions invalid at common law and to prevent fraud. *Kearney v. Vann,* 154 N.C. 311, 70 S.E. 747; *Caldwell v. Blount,* 193 N.C. 560, 137 S.E. 578; *Ingram v. Easley,* 227 N.C. 442, 42 S.E. 2d 624. Under the terms thereof, a deed from wife to husband is valid, provided it is duly proven as required by law, and the certifying officer finds and concludes that the contract is not unreasonable or injurious to her, and incorporates such finding and conclusion in his certificate. *Sims v. Ray, supra; Rea v. Rea,* 156 N.C. 529, 72 S.E. 573. If the Constitution had already stricken the shackles which denied the wife the right to contract with her husband, then why this Act? If under the provisions of the Constitution a married woman was free to convey her land to her husband "with his written assent," why impose—indeed, could the Legislature impose—additional and more restrictive conditions? In any event, the enactment of this statute shortly after the adoption of Art. X, sec. 6, clearly indicates the people then did not construe the language of the Constitution as defendants would have us construe it. *Reade v. Durham,* 173 N.C. 668, 92 S.E. 712.

For the reasons stated the judgment entered in the court below is
Affirmed.