LINDA FAYE SNEED, ON BEHALF OF HERSELF AND AS GUARDIAN AD LITEM FOR HER
MINOR CHILD; MARGIE DEMASTUS, ON BEHALF OF HERSELF, AND AS GUARDIAN
AD LITEM FOR HER MINOR CHILD; JANIFAR WILLIAMSON, ON BEHALF OF
HERSELF AND AS GUARDIAN AD LITEM FOR HER MINOR CHILDREN; AND ALL OTHER
SIMILARLY SITUATED V. GREENSBORO CITY BOARD OF EDUCATION;
JAMES F. BETTS, AS CHAIRMAN OF THE GREENSBORO CITY BOARD OF EDUCA-
TION; DR. KENNETH NEWBOLD IN HIS CAPACITY AS SUPERINTENDENT OF THE
GREENSBORO PUBLIC SCHOOLS; JOSEPH R. BROOKS, IN HIS CAPACITY AS CHAIR-
MAN OF THE INTERIM MANAGEMENT COMMITTEE; AND RUFUS L. EDMISTEN, IN
HIS CAPACITY AS ATTORNEY GENERAL OF NORTH CAROLINA

No. 84

(Filed 1 April 1980)

1. Schools § 2— free public schools—incidental course and instructional fees

The guarantee of a "general and uniform system of free public schools" in
Art. IX, § 2(1) of the N. C. Constitution, as amended in 1970, refers to a tui-
tion free education and does not preclude a school board from requiring public
school students and their parents who are able to do so to pay modest,
reasonable instructional fees for the purchase of supplementary supplies and
materials, course fees, and rental and user fees. A fee schedule adopted by the
Greensboro City Board of Education was constitutional where the highest in-
structional fee was the junior high school fee of $7.00 per semester, the
highest course fee was $4.00 per semester for typing, and the highest rental or
user fee was a $5.00 per semester charge for the rental of a musical instru-
ment.

2. Schools § 2— unconstitutionality of fee waiver policy

A fee waiver policy adopted by the Greensboro City Board of Education
was unconstitutional where it failed to establish a mechanism by which the
schools would affirmatively notify students and their parents of the availabili-
ty of a waiver or reduction of the fee or by which the students or parents
themselves might apply for a partial or complete exemption from the fee re-
quirements, since the waiver policy did not fairly guarantee to low income and
indigent students their right under Art. I, § 15 and Art. IX, § 2(1) of the N. C.
Constitution of equal access to the educational opportunities available at their
schools and did not accord procedural due process to such students.

ON appeal from a judgment entered by *Judge Kivett*,
presiding at the 27 November 1978 Civil Session of GUILFORD
Superior Court, declaring student fee collection practices of de-
fendants violative of the North Carolina Constitution. Pursuant to
G.S. 7A-31 this Court granted petition for discretionary review on
28 June 1979 prior to determination by the Court of Appeals. This
case was docketed and argued as No. 69, Fall Term 1979.

*Central Carolina Legal Services, Inc., by Richard M. Greene and Jacqueline Forman, Attorneys for plaintiff-appellees.*

*Nichols, Caffrey, Hill, Evans, and Murrelle, by William D. Caffrey and R. Thompson Wright, Attorneys for defendant appellants Greensboro City Board of Education, James F. Betts, Dr. Kenneth Newbold, and Dr. Joseph R. Brooks.*

*Rufus L. Edmisten, Attorney General, by Andrew A. Vanore, Jr., Senoir Deputy Attorney General for the state.*

*Tharrington, Smith & Hargrove, by George T. Rogister, Jr., and Carlyn G. Poole, Attorneys for North Carolina School Boards Association, Inc., amicus curiae.*

EXUM, Justice.

[1]   The central question presented by this case is whether our state constitutional guarantee of a "general and uniform system of free public schools" precludes the charging of public school students with incidental course and instructional fees. We answer that it does not. We find no constitutional bar to the collecting by our public schools of modest, reasonable fees for the purpose of enhancing the quality of their educational effort.

Article IX, Section 2(1) of the North Carolina Constitution, as amended in 1970, directs that "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of *free public schools* . . . wherein equal opportunities shall be provided for all students." (Emphasis supplied.) Relying on this provision, plaintiffs instituted this action on 12 June 1978, seeking declaratory and injunctive relief with regard to the practice in the Greensboro City School System of charging students instructional and course fees, and of requiring students to furnish certain instructional materials and gym uniforms on their own. After hearing cross-motions for summary judgment, Judge Kivett ruled on 19 March 1979 that the imposition by defendants of any instructional or course fees, or any requirement by defendants that students furnish any item which is a "necessary element" to their participation in courses offered for academic credit, violates the "free school" constitutional mandate. The March 19 order permanently enjoined defendant Greensboro City Board of Education from continuing such practices. Judge Kivett further held that

Sneed v. Board of Education

the Board's policy of waiving school fees in cases of indigency was unconstitutional in that it failed to provide a uniform procedure whereby all students and their parents would be notified of the policy and could apply for the waiver. For reasons which follow, we reverse Judge Kivett's order of injunction but affirm his ruling that the waiver policy is constitutionally infirm.

The student fee schedule established by Greensboro City Board of Education is not substantially different from similar schedules established by many other local boards of education throughout the state.[1] The charges imposed fall into three categoreis: (1) "instructional fees" are charges imposed school-wide on each pupil at the beginning of each school semester. In

---

1. In 1977-78, nearly 80 percent of the state's 145 school units required fees of one sort or another. Eighty-nine of the units imposed flat "instructional fees" upon every student within a given grade level. Dellinger, "The Unresolved Status of Public School Fees," IX School Law Bulletin, No. 2, p. 2. (April 1978).

The collection of school fees is not uncommon in other states, despite the fact that the constitutions of 49 of the 50 states bear provisions that promise some sort of a "free" public school system. *Id.* Appellate courts of other jurisdictions have reached varying results where faced with state constitutional issues similar to those raised here. *See, e.g., Marshall v. School District Re #3 Morgan City,* 553 P. 2d 784 (Colo. 1976) (constitutional requirement of a "uniform system of free public schools" held not to require the provision of free textbooks or to ban rental fees); *Paulson v. Minidoka County School District No. 331,* 93 Idaho 469, 463 P. 2d 935 (1970) (constitutional mandate of a system of "public, free commmon schools" precludes the charging of a lump sum instructional fee or textbook fees); *Hamer v. Board of Education of School District No. 109,* 47 Ill. 2d 480, 265 N.E. 2d 616 (1970) (constitutional provision of a "thorough and efficient system of free schools" is not violated by the imposition of textbook fees); *Chandler v. South Bend Community School Corp.,* 160 Ind. App. 592, 312 N.E. 2d 915 (1974) (constitutional provision for public schools "whereby tuition shall be without charge" held not to guarantee free textbooks); *Bond v. Public Schools of Ann Arbor School District,* 383 Mich. 693, 178 N.W. 2d 484 (1970) (per curiam) (new language in the 1963 constitution providing for "a system of free public elementary and secondary schools" held to prohibit the charging of textbook or instructional fees); *Concerned Parents v. Caruthersville School District,* 548 S.W. 2d 554 (Mo. 1977) (constitutional requirement of "free public schools for the gratuitous instruction of all persons" interpreted to bar all fees for academic credit courses); *Granger v. Cascade County School District No. 1,* 159 Mont. 516, 499 P. 2d 780 (1972) (constitutional provision for a "general, uniform, and thorough system of public, free, common schools" construed to prohibit fees for any activity "reasonably related to a recognized academic and educational goal of the particular school system"); *Norton v. Board of Education of School District No. 16,* 89 N.M. 470, 553 P. 2d 1277 (1976) (constitutional promise of a "uniform system of free public schools" prevents charging fees for required courses; reasonable fees allowed for elective courses); *Board of Education v. Sinclair,* 65 Wis. 2d 179, 222 N.W. 2d 143 (1974) (constitutional mandate that "schools shall be free and without charge for tuition" allows the charging of textbook fees but prohibits instructional fees for credit courses.)

the Greensboro City System, these charges vary from as little as $5.00 per year ($2.50 per semester) for elementary school students to as much as $14.00 per year ($7.00 per semester) for students at the junior high school level. The fee proceeds are placed in an instructional materials fund in each school and are used to purchase supplemental educational materials and supplies. (2) "Course fees" are special fees imposed to defray the costs of fungible supplies and materials consumed in certain individual courses such as art, typing, vocational education, and laboratory science courses. All of these courses are offered for academic credit. Some are required, in the sense that the North Carolina Department of Public Instruction requires their completion before graduation from high school or junior high school. Others are elective, and can be credited toward the minimum hours of instruction required for graduation or promotion to a higher level. (3) "Rental and use fees" are customarily demanded for locker rentals, musical instrument rentals, and the rental (or required purchase) of gym uniforms for use in required physical education courses.

At the initiation of the present suit, these fees were charged without ascertaining the financial ability of individual students or their parents to pay them. Some exceptions, or waivers of fees, were made on a case by case basis, but there was no uniform waiver policy or procedure. Students who did not pay the required fees were subject to a variety of sanctions. The schools would, for example, withhold diplomas and grade reports, refuse to grant enrollment in the next semester, or deny registration in individual courses.

Plaintiffs contend the collection of any and all such fees is *now* prohibited by the "free public schools" language of the 1970 constitutional amendment to Article IX, Section 2(1). Prior to 1970 this provision read:

"The General Assembly at its first session under this Constitution, shall provide by taxation and otherwise for a general and uniform system of public schools, *wherein tuition shall be free of charge* to all the children of the State between the ages of six and twenty-one years. And the children of the white race and the children of the colored race shall be taught in separate Public Schools, but there shall be no discrimination in favor of, or to the prejudice of either race." (Emphasis supplied.)

Plaintiffs argue that the 1970 deletion of the reference to free "tuition" and the insertion into the section of the words "free public schools" clearly evidences the intent of both the drafters of the 1970 amendment and the voters who approved it to make a substantive change in Article IX. According to plaintiffs, the constitution now requires that the legislature provide a system of *free* public schools operated completely without any cost or charge to any pupil. Any other interpretation, plaintiffs say, would fly in the face of the plain meaning of clear and unambiguous language. We do not agree with this position.

Few words have so fixed and literal a meaning as to preclude the necessity of examining the circumstances of their context and occasion for use. Where the construction of a constitutional provision is at issue, as here, it is incumbent upon this Court to interpret the organic law in accordance with the intent of its framers and the citizens who adopted it. Inquiry must be had into the history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought to be accomplished by its promulgation. "The court should place itself as nearly as possible in the position of the men who framed the instrument." *Perry v. Stancil,* 237 N.C. 442, 444, 75 S.E. 2d 512, 514 (1953).

Applying these well established principles of construction to the case, we find first that the use of the word "free" in our constitution's references to the public schools of this state is not a novelty of the 1970 constitutional revision. Although Article IX, Section 2 of the 1868 Constitution spoke only of "free" *tuition,* subsequent sections in the same article were replete with references to our system of "free public schools." For example, Article IX, Section 4 of the 1868 Constitution[2] directed that certain state funds "be faithfully appropriated for establishing and perfecting in this State a system of free public schools . . . ." Section 5 provided that the University of North Carolina "shall be held to an inseparable connection with the free public school system of the State." Section 9 spoke of the power of the State Board of Education to make all needful rules and regulations in relation to "free public schools." Certainly as far as the framers were concerned, our schools were required to be "free" in 1868.

---

2. Substantially the same as Article IX, Section 6 of the 1970 constitution.

They were no less so by reason of later amendments to Article IX. Section 5 was deleted in 1875 and replaced with a provision directing that monies in the county school fund "shall be faithfully appropriated for establishing and maintaining free public schools in the several counties of this State . . . ."[3] Section 8, as amended in 1942 and 1944, referred to the responsibility of the State Board of Education for the "general supervision and administration of the free public school system."[4] It is obvious that the language quoted above in each of these sections refers to the general and uniform system of public schools, "wherein tuition shall be free of charge," mentioned in Section 2. *See, e.g., Greensboro v. Hodgin,* 106 N.C. 182, 186-187, 11 S.E. 586, 587-88 (1890). In light of this history, plaintiffs' argument that the incorporation of the word "free" in the 1970 amendment to Section 2 effects *per se* a substantive change becomes less than compelling.

Second, a review of the general history of the development of our public schools establishes that the state's provision of "free" schools has never been understood to require the absence of modest, supplementary support given by those able to pay it. Archibald Murphey's ambitious proposal in 1817 that the state furnish universal education for "the rich and the poor, the dull and the sprightly" called for free instruction in the primary schools for indigent children, but provided that tuition would be charged to children able to pay. Lefler and Newsome, *North Carolina: The History of a Southern State,* 329-30 (1973); Coon, *The Beginnings of Public Education in North Carolina: A Documentary History* Vol. 1, 130, 143-44 (1908). The *charity feature* of Murphey's plan was abandoned in the School Law of 1839, which established for the first time a statewide local option system of "common" schools, "free" in the sense that tuition and capital costs were paid out of state and local funds. 1839 N.C. Sess. Laws, c. 8. During Reconstruction, the state system was reorganized pursuant to Article IX of the 1868 Constitution and the Public School Law of 1869. 1869 N.C. Sess. Laws, c. 184. Even at that time, however, it was not understood that the constitutional requirement of a "free" public school system contemplated a complete prohibition

---

3. *Compare* Article IX, Section 7 of the 1970 constitution.

4. This language is now contained in Article IX, Section 4 of the 1970 constitution.

of the collection of modest supplemental fees. Commenting on the school legislation of 1871-72, State Superintendent of Public Instruction Alexander McIver wrote:

> "It is much easier for those who are able to pay for the education of their children to supplement the aid which the state can give, and have a public school, than to employ a teacher and have a private school. In this manner a public school may be established in every school district in the state, *wherein tuition or instruction* shall be free of charge to all children between the ages of six and twenty-one years. A public school, however, cannot be maintained free of charge to such parents and guardians as may be able to pay. They must necessarily pay a tax to support the school; and if the law should compel every person, who sends one or more children to a public school, to pay fixed school rates to the teacher, except such persons as the district trustees and school committees might exempt on account of their inability to pay, it would, as I think, be no violation to the letter or spirit of the constitution." Quoted in Noble, *A History of the Public Schools of North Carolina* 360 (1930). (Emphasis original.)

In one form or another, North Carolina has maintained its system of "free" public schools ever since 1840, with the exception of the few years immediately after the Civil War. Yet it was not until 1969 that the General Assembly even required the free furnishing without rental charge of basic text books to all students. 1969 N.C. Sess. Laws, c. 519, s. 1; *see* G.S. 115-206.12, 115-206.16. Furthermore, the widespread practice of imposing "fees, charges, or costs" on students was explicitly recognized by the legislature in 1963, when it was then provided that no such fees "shall be collected from students and school personnel without approval of the [local] board of education as recorded in the minutes of said board." 1963 N.C. Sess. Laws, c. 425, *now codified* as G.S. 115-35(f). Prior to the 1970 constitution revision, then, there was little to indicate that either the members of our General Assembly or the officials responsible for administering our "free" public schools have ever understood the word "free" to encompass more than the notion of free tuition.

Third, an examination into the circumstances of the 1970 constitutional revision reveals not the slightest support for the sug-

gestion that the insertion of the term "free public schools" into Article IX, Section 2(1) was intended to stop the then widespread collection of modest course or instructional fees. In the official commentary on the proposed revision to Article IX, the Constitution Study Commission noted merely that "Article IX has been rearranged to improve the order of treatment of the subject dealt with by that article, and its language has been modified to eliminate obsolete provisions and to make the article *reflect current practice in the administration and financing of schools.*" *Report of the North Carolina State Constitution Study Commission* 34 (1968). (Emphasis supplied.) Among the "obsolete provisions" eliminated from Section 2 was the reference in the 1868 constitution, as amended in 1875, to the separation of the races. That the previous concept of free tuition was not intended to be changed, however, is clearly implied by the Commission's further comment: "Proposed Section 2 extends the mandatory school term from six months to a minimum of nine months and eliminates the restrictive age limits *on tuition-free public schooling.*" *Id.* (Emphasis supplied.) No other pertinent reference to the "free public schools" phrase in Section 2 is to be found in the official commentary.

In the presence of clear indications to the contrary, this Court cannot assume that it was the intent of the framers of the 1970 constitution to have enacted such a radical change in our organic law as plaintiffs contend. Surely "if such was the intention, it is reasonable to presume it would have been declared in direct terms and not be left as a matter of inference." *Perry v. Stancil, supra,* 237 N.C. at 447, 75 S.E. 2d at 516. Nor can we assume that, whatever the intent of the framers, the citizens intended by their adoption at the polls of the 1970 constitutional changes to inaugurate a new era of totally free public education. The ballot issue presented to the state's voters at the November 1970 General Election provided for no more than a vote "FOR revision and amendment of the Constitution of North Carolina" or "AGAINST" the same. *See* 1969 N.C. Sess. Laws, c. 1258, s. 3. With no evidence before us that the meaning of "free public schools" was even raised as an issue in the public discussion and debate surrounding the 1970 constitutional revision, we cannot read into the voice of the people an intent that in all likelihood had no occasion to be born.

We conclude, therefore, that the 1970 reference in Article IX, Section 2(1) to "a general and uniform system of free public schools" requires no substantive change in the state's long standing policy of providing its citizens with a basic *tuition free* education. So long as public funds are used to provide the physical plant and personnel salaries necessary for the maintenance of a "general and uniform" system of basic public education, our public school system is "free"—that is, without tuition—within the meaning of our state constitution. That the administrative boards of certain school districts require those pupils or their parents who are financially able to do so to furnish supplies and materials for the personal use of such students does not violate the mandate of Article IX, Section 2(1). Nor do we perceive any constitutional impediment to the charging of modest, reasonable fees[5] by individual school boards to support the purchase of *supplementary* supplies and materials for use by or on behalf of students. Accordingly, we hold today that the fee schedule adopted by the Greensboro City Board of Education and imposed upon those students and their parents who are financially able to pay contravenes neither the letter nor spirit of our constitutional requirement of "free public schools."[6]

[2]    We turn now to the matter of the fee waiver policy recently established by the Greensboro City School System. During the pendency of this suit in superior court, defendant Greensboro City Board of Education adopted a system-wide policy relating to the collection of its school fees. That policy provides *inter alia* that any student suffering economic hardship "shall be referred

---

5. What is a "modest, reasonable" fee depends of course upon the facts and circumstances of the individual case. According to the fee schedule adopted by defendant Greensboro City Board of Education, the highest instructional fee charged in the Greensboro City Schools in 1977-78 was the junior high school fee of $7.00 per semester. The highest course fee was a $4.00 per semester charge for a typing course. The highest rental or user fee imposed was a $5.00 per semester charge for the rental of a musical instrument. We view these fees to be entirely reasonable and their burden *de minimis*. Other school systems have charged substantially higher fees, especially for such courses as vocational and business education. *See, e.g.*, N.C. Department of Public Instruction, 1978-79 Fee Reporting Forms Results.

6. Our opinion today expresses no judgment upon the social merits of the fee policies of our public schools. We hold only that Article IX of the North Carolina Constitution does not preclude the imposition of supplementary school fees such as are involved in the instant case. Whether the levy of such fees is entirely consistent with certain ideals of universal education is a question of legislative policy, not constitutional prohibition.

to the principal of the school, who in turn, shall determine if the . . . fees for the student should be waived." The principal is to determine whether waiver or the charging of reduced fees is appropriate by referring to a sliding fee schedule based upon state guidelines established for free or reduced price school cafeteria meals. If no waiver is granted, however, failure to pay required fees will result in the denial of school enrollment in the next semester. In his order of 19 March, Judge Kivett found the waiver policy unconstitutional "in that it fails to provide a means for notifying parents and students of the change in the collection policy and a procedure for applying for a waiver." We agree.

As noted above, Article IX, Section 2(1) of our constitution guarantees a uniform public school system "wherein equal opportunities shall be provided for all students." Additionally, Article I, Section 15 provides that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." The force of these constitutional provisions is recognized in the declared policy of this state "to ensure every child a fair and full opportunity to reach his full potential." G.S. 115-1.1. It is clear, then, that equal access to participation in our public school system is a fundamental right, guaranteed by our state constitution and protected by considerations of procedural due process. U.S. Constitution, Amendment XIV; North Carolina Constitution, Article I, Section 19; *Givens v. Poe*, 346 F. Supp. 202 (W.D.N.C. 1972). Where that right is threatened with restrictions, the basic fairness of the procedures employed must be evaluated in light of the particular parties, the subject matter, and the circumstances involved. *Grimes v. Nottoway County School*, 462 F. 2d 650, 653 (4th Cir. 1972), *cert. denied*, 409 U.S. 1008.

Defendants in this case concede that it would be unconstitutional to penalize or deny enrollment to a student who cannot pay required fees because of real economic hardship. Defendants' brief further concedes that prior to the adoption of the new uniform waiver policy, economic hardship *which was not brought to the attention* of the school system "could have" resulted in the imposition of sanctions against indigent students delinquent in their fee payments. Defendants contend nevertheless that the new waiver policy now adequately ensures that no student in the Greensboro City School System will be denied educational opportunities because of unfavorable economic status. That policy, how-

ever, provides only that students suffering from economic disabilities "shall be referred" to the principal for a determination on the matter of waiver or reduction of fees. No mechanism is established by which the schools shall affirmatively notify students and their parents of the availability of a waiver or fee reduction, nor by which the students or parents themselves may apply for a partial or complete exemption from fee requirements. The inevitable result is that those students who are finally accorded the benefits of the waiver policy must first risk the stigma of being picked out from their peers on the basis of their economic status and then somehow "referred" to the principal. Other students who may in fact qualify for fee waiver or reduction may instead elect to forego certain educational opportunities, either because they feel inhibited by the possible publicity of their indigency or because they wish to avoid the attendant fees and are simply unaware of the availability of relief. In light of these circumstances, we cannot agree that defendants' waiver policy fairly guarantees to low income and indigent students their constitutional right of equal access to the educational opportunities available at their schools. Due process is not met by a procedure which accords a fundamental right only to the already informed, or which engenders unnecessary obstacles to the right's fulfillment.

We note, however, that these infirmities can be easily cured. Defendants need only amend their waiver policy to ensure that all students and their parents are given adequate and timely notice of the waiver policy's substance and the simple procedures by which they may confidentially apply for its benefits. So amended, the policy would then likely comport with the requirements of procedural due process. Until the waiver policy is sufficiently revised, however, the injunction prohibiting defendants from charging or collecting fees should remain in effect. Accordingly, we remand the case to the jurisdiction of the Superior Court of Guilford County with directions to the court to lift the injunction at such time as it may be satisfied that defendants' fee collection and waiver procedures are constitutionally sound.

For the foregoing reasons, the decision by the trial court that defendant Greensboro City Board of Education cannot constitutionally charge students with instructional, course, or user fees is reversed. The decision by the trial court that defendant Board of Education's fee waiver policy is unconstitutional is affirmed, and

the case is remanded for such further proceedings not inconsistent with this opinion as may be required.

Affirmed in part.

Reversed in part and remanded.