VIKTORIA KING, A MINOR, BY AND THROUGH HER PARENT, REVONDIA HARVEY-BARROW
v. BEAUFORT COUNTY BOARD OF EDUCATION AND JEFFREY MOSS,
SUPERINTENDENT, BEAUFORT COUNTY SCHOOLS, IN HIS OFFICIAL CAPACITY

No. 480A09

(Filed 8 October 2010)

## 1. Long-term suspension— alternative education—reasons for exclusion

While the denial of alternative education to a high school student during her long-term suspension for a willful violation of a lawful school rule is not a violation of the state constitution, a long-term suspended student has a statutory right to receive alternative education when feasible and appropriate, and a suspended student excluded from alternative education has a state constitutional right to be informed by school administrators of the reason for the exclusion because the exclusion from alternative education potentially infringes on the student's right to equal educational access under N.C. Const. art. I, § 2(1).

## 2. Schools and Education— long-term suspension—alternative education—reasons for exclusion—standard of scrutiny

Alternative education decisions for students who receive long-term suspensions are reviewed under the state constitutional standard of intermediate scrutiny because: (1) strict scrutiny fails to accord sufficient respect for school officials' informed judgments regarding the provision of alternative education and imposes untenable administrative burdens, and applying strict scrutiny to long-term suspensions jeopardizes the safety of the greater school community and impedes the educational progress of the suspended students' peers; (2) rational basis review does not adequately protect student access to educational opportunities or guard against arbitrary decisions or inadvertent errors by school officials; (3) under the state intermediate scrutiny standard, school administrators must articulate an important or significant reason for denying students access to alternative education, although the reasons supporting their decisions do not need to be compelling; (4) in the school disciplinary context, intermediate scrutiny strikes a practical balance between protecting student access to educational opportunities and empowering school officials to maintain safe and orderly

schools; and (5) the requirement that school administrators artic-
ulate an important or significant reason for denying educational
services is not unduly burdensome since the people of North
Carolina "have a right to the privilege of education." N.C. Const.
art. I, § 15.

Justice TIMMONS-GOODSON concurring in part and dissent-
ing in part.

Justice HUDSON joining in opinion concurring in part and
dissenting in part.

Justice NEWBY dissenting.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of
a divided panel of the Court of Appeals, 200 N.C. App. ——, 683
S.E.2d 767 (2009), affirming an order entered 16 May 2008 by Judge
William C. Griffin, Jr. in Superior Court, Beaufort County. Heard in
the Supreme Court on 22 March 2010.

*Children's Law Clinic, Duke Law School, by Jane Wettach; and
Advocates for Children's Services, Legal Aid of North Carolina,
Inc., by Erwin Byrd and Lewis Pitts, for plaintiff-appellant.*

*Tharrington Smith, L.L.P., by Curtis H. Allen III, for defend-
ant-appellee Beaufort County Board of Education.*

*Edelstein and Payne, by M. Travis Payne, for North Carolina
Advocates for Justice, amicus curiae.*

*University of North Carolina School of Law Center for Civil
Rights, by Mark Dorosin and Benita N. Jones, for Advancement
Project, Advocates for Basic Legal Equality, Inc., Legal Aid of
Western Ohio, Inc., Advocates for Children of New York,
Alabama Disabilities Advocacy Program, American Civil
Liberties Union, Barton Child Law & Policy Clinic, Center for
Civil Rights at UNC School of Law, Charles Hamilton Houston
Institute for Race and Justice at Harvard Law School, Children
and Family Justice Center; Children's Law Center of
Massachusetts, Connecticut Legal Services, Inc., Council of
Parent Attorneys and Advocates, Education Law Center,
Juvenile Justice Project of Louisiana, Legal Aid Society of
Birmingham, Legal Assistance Foundation of Metropolitan
Chicago; NAACP Legal Defense & Educational Fund, Inc.,*

*National Association of Counsel for Children, National Association of Social Workers, National Children's Law Network, National Economic and Social Rights Initiative, New York Law School Racial Justice Project, Public Counsel, Southern Poverty Law Center, TeamChild, University of Tennessee College of Law Education Law Practicum, Sharon A. Bourne-Clarke, Melissa Kenney Ngaruri, Heather E. Price, Russell Skiba, Anita Wadhwa, and Julie Waterstone, amici curiae.*

*Laurie Gallagher for Council for Children's Rights, amicus curiae.*

*Jack Holtzman for North Carolina Justice Center, Concerned Citizens for the Betterment of Beaufort County Schools, Parents Supporting Parents, Tamar Birckhead, American Civil Liberties Union of North Carolina Legal Foundation, Southern Coalition for Social Justice, Center for Death Penalty Litigation, Inc., Office of the Juvenile Defender, North Carolina Black Leadership Caucus, and NC Conference of NAACP Branches, amici curiae.*

*Robert F. Orr and Charles L. Becton, amici curiae.*

*Campbell Shatley, PLLC, by Christopher Z. Campbell; and Allison B. Schafer, General Counsel, for North Carolina School Boards Association, amicus curiae.*

*Ann McColl, General Counsel; and William A. Tobin, Social Science Research Institute, Duke University, for North Carolina Association of School Administrators, amicus curiae.*

MARTIN, Justice.

This case presents the question of whether the Beaufort County School Board and its superintendent (defendants) violated state law by denying Viktoria King (plaintiff) access to alternative education during her long-term suspension from school. After considering long-standing precedent affording school officials discretion in administering student disciplinary codes and recent cases recognizing a state constitutional right to a sound basic education, we hold that defendants must articulate a reason for denying plaintiff access to alternative education during her long-term suspension.

**KING v. BEAUFORT CTY. BD. OF EDUC.**

[364 N.C. 368 (2010)]

On 18 January 2008, plaintiff, a sophomore at Southside High School in Beaufort County, participated in a fight involving numerous students. She received a ten-day suspension for her involvement in the fight. The principal at Southside High School also recommended that plaintiff receive a long-term suspension. On 1 February 2008, the Beaufort County Superintendent, Jeffrey Moss, adopted the principal's recommendation and suspended plaintiff for the remainder of the 2007-2008 school year without offering her alternative education. Plaintiff timely appealed the suspension to a panel of central office administrators. On 13 February 2008, the panel conducted a due process hearing and subsequently upheld the decision.

On 20 February 2008, plaintiff filed a complaint in Superior Court seeking injunctive and declaratory relief. Plaintiff alleged that defendants violated her state constitutional right to a sound basic education by failing to provide her access to alternative education. Plaintiff also filed a Motion for Temporary Restraining Order and Preliminary Injunction, requesting that the trial court order defendants to provide educational services to plaintiff during her suspension. The trial court denied this motion and dismissed plaintiff's complaint pursuant to Rules 12(b)(6) and 12(b)(7) of the North Carolina Rules of Civil Procedure. The Court of Appeals, in a divided opinion, affirmed the trial court's ruling in favor of defendants. *King ex rel. Harvey-Barrow v. Beaufort Cty. Bd. of Educ.*, —— N.C. App. ——, 683 S.E.2d 767 (2009).

[1] Plaintiff alleges that defendants' denial of alternative education during her long-term suspension is a violation of the state constitution. Before this Court plaintiff repeatedly emphasized the importance of requiring defendants to articulate a reason for denying her access to alternative education. While the state constitution requires defendants to provide a reason for refusing alternative education to plaintiff, we decline plaintiff's invitation to create a constitutional right to alternative education for students who violate lawful school rules.

The General Assembly has enacted a comprehensive statutory scheme specifying the powers and duties of local school boards and school officials in connection with school discipline and alternative education. The statute vests school officials with the authority to issue long-term suspensions to students "who willfully violate[] the policies of conduct established by the local board of education." N.C.G.S. § 115C-391(c) (2009). Section 115C-47(32a) requires local boards of education to "establish at least one alternative learning

program and . . . adopt guidelines for assigning students to alternative learning programs." *Id.* § 115C-47(32a) (2009). In addition to mandating alternative learning programs, the General Assembly requires local boards of education to create "strategies for providing alternative learning programs, when feasible and appropriate, for students who are subject to long term suspension or expulsion." *Id.* The statute encourages school boards to incorporate these strategies into their "safe school plans," which are "designed to provide that every school . . . is safe, secure, and orderly . . . ." *Id.*; N.C.G.S. § 115C-105.47 (2009). This comprehensive scheme grants long-term suspended students a statutory right to receive alternative education when feasible and appropriate.

In acknowledging a statutory right to alternative education, we stress that a fundamental right to alternative education does not exist under the state constitution. Nevertheless, insofar as the General Assembly has provided a statutory right to alternative education, a suspended student excluded from alternative education has a state constitutional right to know the reason for her exclusion. This right arises from the equal access provisions of Article IX, Section 2(1) of the North Carolina Constitution. *See Leandro v. State*, 346 N.C. 336, 347, 488 S.E.2d 249, 255 (1997) ("Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state *an opportunity* to receive a sound basic education in our public schools." (emphasis added)); *Sneed v. Greensboro City Bd. of Educ.*, 299 N.C. 609, 618, 264 S.E.2d 106, 113 (1980) ("[E]qual access to participation in our public school system is a fundamental right, guaranteed by our state constitution and protected by considerations of procedural due process." (citations omitted)). Because exclusion from alternative education potentially infringes on a student's state constitutional right to equal educational access, school administrators must articulate a reason when they exclude a long-term suspended student from alternative education.

[2] Having observed that our holding does not recognize a state constitutional right to alternative education, we consider the standard of review to be applied when a suspended student is denied access to alternative education. The present case requires us to harmonize the rational basis test employed in school discipline cases with the strict scrutiny analysis that formed a part of this Court's constitutional holding in school funding cases. *Compare Hutchins v. [Sch. Comm. of] Durham*, 137 N.C. 68, 70-71, 49 S.E. 46, 47 (1904) ("[T]he constitutional guarantee that tuition shall be free and the schools equally

open to all is necessarily subject to reasonable regulations to enforce discipline by expulsion of the disorderly and protection of the morals and health of the pupils." (citations omitted)), *with Leandro*, 346 N.C. at 345, 488 S.E.2d at 254 ("[T]he right to education provided in the state constitution is a right to a sound basic education."). The tension between these differing standards of review must be resolved in a manner that (1) protects student access to educational opportunities, while (2) preserving the discretion of school officials to maintain safe and orderly schools.

North Carolina courts have historically accorded school administrators great deference in the exercise of their disciplinary authority. For instance, in *Coggins ex rel. Coggins v. Board of Education*, this Court upheld the school board's decision to bar students from participating in certain organizations. 223 N.C. 763, 770, 28 S.E.2d 527, 532 (1944). In so doing, we noted that "the local board is the final authority so long as it acts in good faith and refrains from adopting regulations which are clearly arbitrary or unreasonable." *Id.* at 769, 28 S.E.2d at 531. In *Craig ex rel. Craig v. Buncombe County Board of Education*, the Court of Appeals upheld the decision of school officials to suspend students for smoking on campus since the school's "legitimate concerns" were "reasonably related to the educational process and thus provide[d] a rational basis for the regulation." 80 N.C. App. 683, 686, 343 S.E.2d 222, 224 (1986) (citation omitted), *disc. rev. denied and appeal dismissed*, 318 N.C. 281, 348 S.E.2d 138 (1986). Indeed, the Court of Appeals observed that "a student may be constitutionally suspended or expelled for misconduct whenever the conduct is of a type the school may legitimately prohibit." *In re Jackson*, 84 N.C. App. 167, 176, 352 S.E.2d 449, 455 (1987).

Despite this well-established precedent, plaintiff urges this Court to adopt strict scrutiny for school disciplinary determinations. Most courts, however, review school disciplinary decisions using a more deferential standard. *See, e.g., Tucson Pub. Sch., Dist. No. 1 v. Green ex rel. Askew*, 17 Ariz. App. 91, 94, 495 P.2d 861, 864 (1972); *Satan Fraternity v. Bd. of Pub. Instruction*, 156 Fla. 222, 225, 22 So. 2d 892, 893 (1945); *Wilson v. Hinsdale Elementary Sch. Dist. 181*, 349 Ill. App. 3d 243, 248, 810 N.E.2d 637, 642 (2004); *S. Gibson Sch. Bd. v. Sollman*, 768 N.E.2d 437, 442 (Ind. 2002); *Davis v. Hillsdale Cmty. Sch. Dist.*, 226 Mich. App. 375, 379-81, 573 N.W.2d 77, 79 (1997) (per curiam); *Busch v. Omaha Pub. Sch. Dist.*, 261 Neb. 484, 488, 623 N.W.2d 672, 677 (2001); *Hamilton v. Unionville-Chadds Ford Sch.*

*Dist.*, 552 Pa. 245, 247, 714 A.2d 1012, 1014 (1998). Even the Supreme Court of Wyoming, one of the few state courts to apply strict scrutiny in this context, acknowledges that "school districts are in the best position to judge the student's actions in light of all the surrounding circumstances and tailor the appropriate punishment to fit the unique circumstances of each student's situation." *In Re RM*, 2004 WY 162, ¶ 25, 102 P.3d 868, 876 (Wyo. 2004). Put simply, "the special context of public schools requires a more lenient approach to reviewing the decisions of school officials, and the professional judgments of school officials on school safety and student discipline issues are entitled to appropriate judicial deference." John Dayton & Anne Proffitt Dupre, *Searching for Guidance in Public School Search and Seizure Law: From* T.L.O. *to* Redding, 248 Educ. L. Rep. 19, 27-28 (2009) (citations omitted).

At the same time, we have held strict scrutiny applicable to some educational issues. In *Leandro v. State*, this Court applied strict scrutiny to the question of whether the state had failed to provide students in low-income districts "a sufficient education to meet the minimal standard for a constitutionally adequate education." 346 N.C. at 342, 488 S.E.2d at 252. Within the context of school funding, the Court concluded that "Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools." *Id.* at 347, 488 S.E.2d at 255. In contrast to our school discipline cases, *Leandro* placed the burden on the state "to establish that [its] actions denying this fundamental right [were] 'necessary to promote a compelling governmental interest.' " *Id.* at 357, 488 S.E.2d at 261 (citation omitted); *see Stephenson v. Bartlett*, 355 N.C. 354, 377-78, 562 S.E.2d 377, 393 (2002) ("Under strict scrutiny, a challenged governmental action is unconstitutional if the State cannot establish that it is narrowly tailored to advance a compelling governmental interest." (citation omitted)).

But *Leandro* does not immunize students from the consequences of their own misconduct. A critical distinction exists between the state uniformly denying students in low-income districts access to a sound basic education and the state offering all students a sound basic education but temporarily removing students who engage in misconduct that disrupts the sound basic education of their peers. As we have said, "The right to attend school and claim the benefits afforded by the public school system is the right to attend subject to all lawful rules and regulations prescribed for the government

thereof." *Coggins*, 223 N.C. at 767, 28 S.E.2d at 530. School administrators undeniably possess both freedom and flexibility to punish students who disrupt the educational process or endanger other students. *See Goss v. Lopez*, 419 U.S. 565, 580, 42 L. Ed. 2d 725, 738 (1975) ("[O]ur schools are vast and complex. Some modicum of discipline and order is essential if the educational function is to be performed."); *Doe v. Superintendent of Sch. of Worcester*, 421 Mass. 117, 131, 653 N.E.2d 1088, 1096 (1995) ("[A] student's interest in a public education can be forfeited by violating school rules." (citations omitted)).

Notwithstanding the long history of judicial deference to the disciplinary determinations of school administrators, plaintiff argues that her *Leandro* right to a sound basic education requires us to apply strict scrutiny to defendants' decision to deny her alternative education. We reject plaintiff's attempt to sever the alternative education determination from her own misbehavior. These matters are legally inseparable in that administrative procedures for the provision of alternative education are inextricably linked with administrative planning for school safety. *See* N.C.G.S. § 115C-47(32a) (encouraging local school boards to incorporate their strategies for providing alternative education to long-term suspended students into their safe school plans); *id.* § 115C-105.47(b)(3) (indicating that safe school plans must include mechanisms to provide alternative education placements for "seriously disruptive" students).

In any event, adoption of strict scrutiny to review disciplinary determinations would necessarily require judges to routinely substitute their own views for those of school administrators. Amicus North Carolina School Boards Association observes: "[Plaintiff] invites this Court to do something that the General Assembly has been unwilling to do: force schools to provide alternative educational services to students who are temporarily removed from school due to their own dangerous or disruptive behavior." We agree with amicus that adoption of strict scrutiny for disciplinary and alternative education decisions by school officials would render "long-term suspension practically unusable as a form of student discipline and flood[] the courts with litigation regarding a myriad of discretionary administrative decisions." Defendant school board adds: "Under Plaintiff's radical interpretation of *Leandro*, . . . courts would be called upon to micro-manage student discipline matters in protracted litigation challenging good faith efforts by the legislature and local boards to maintain safe and orderly schools." We are unwilling to go so far.

Strict scrutiny fails to accord sufficient respect for school officials' informed judgments regarding the provision of alternative education and imposes untenable administrative burdens. In each case in which a school administrator determines that an alternative education placement is inappropriate, the school must prove its disciplinary decision is narrowly tailored to effectuate a compelling interest. *See, e.g., Stephenson,* 355 N.C. at 377-78, 562 S.E.2d at 393 (citations omitted); *Treants Enters., Inc. v. Onslow Cty.,* 83 N.C. App. 345, 351, 350 S.E.2d 365, 369 (1986) (indicating that to survive strict scrutiny, a law "must be narrowly drawn to express only the legitimate interests at stake" (citations omitted)), *aff'd,* 320 N.C. 776, 360 S.E.2d 783 (1987); *see also Dunn v. Blumstein,* 405 U.S. 330, 343, 31 L. Ed. 2d 274, 284 (1972) (noting that strict scrutiny places "a heavy burden of justification . . . on the State"); *Blumstein,* 405 U.S. at 343, 31 L. Ed. 2d at 285 ("And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' " (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 5 L. Ed. 2d 231, 237 (1960))).

Because of the unworkable burdens it imposes on school administrators, applying strict scrutiny to long-term suspensions jeopardizes the safety of the greater school community and impedes the educational progress of the suspended student's peers. *See New Jersey v. T.L.O.,* 469 U.S. 325, 350, 83 L. Ed. 2d 720, 740 (1985) (Powell, J., concurring) ("The primary duty of school officials and teachers, as the Court states, is the education and training of young people. . . . Without first establishing discipline and maintaining order, teachers cannot begin to educate their students. And apart from education, the school has the obligation to protect pupils from mistreatment by other children, and also to protect teachers . . . ."). In contrast to regulatory statutes and criminal codes enacted by legislative bodies, school disciplinary rules are not drafted to withstand strict scrutiny in courts of law. *See Vieth v. Jubelirer,* 541 U.S. 267, 294, 158 L. Ed. 2d 546, 568 (2004) (plurality) (noting that in the context of constitutional review of statutes, "strict scrutiny readily, and almost always, results in invalidation"); Ann L. Majestic, Jean M. Cary & Janine M. Murphy, *Chapter 18: Student Conduct Issues, in* Education Law in North Carolina § 1802.A.1, at 18-5 (2001) ("[S]chool officials have the difficult task of drafting rules that anticipate and define most misbehavior with specificity and also contain some *broad, general phrases* that will cover unanticipated misconduct."

(emphasis added)). Indeed, the United States Constitution does not require school rules to withstand such scrutiny. *See Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686, 92 L. Ed. 2d 549, 560 (1986) ("We have recognized that 'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures . . . .' " (quoting *T.L.O.*, 469 U.S. at 340, 83 L. Ed. 2d at 733)); *id.* at 686, 92 L. Ed. 2d at 560 ("Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, *the school disciplinary rules need not be as detailed as a criminal code* which imposes criminal sanctions." (emphasis added)). Consequently, application of strict scrutiny to the student disciplinary process operates to the detriment of our public school communities.

Rational basis review, on the other hand, does not adequately protect student access to educational opportunities or guard against arbitrary decisions or inadvertent errors by school officials. Under this standard, "[i]t is not necessary for courts to determine the actual goal or purpose of the government action at issue; instead, *any conceivable legitimate purpose* is sufficient." *In re R.L.C.*, 361 N.C. 287, 295, 643 S.E.2d 920, 924 (emphasis added) (citation omitted), *cert. denied*, 552 U.S. 1024, 169 L. Ed. 2d 396 (2007). As applied to alternative education determinations, rational basis review undoubtedly upholds administrative decisions even in the absence of a proffered reason, as plaintiff experienced in the  present case. But this Court's previous recognition of state constitutional rights to equal educational access and a sound basic education compels more exacting review. *See Leandro*, 346 N.C. at 357, 488 S.E.2d at 261; *Sneed*, 299 N.C. at 618, 264 S.E.2d at 113.

Accordingly, we hold that alternative education decisions for students who receive long-term suspensions are reviewed under the state constitutional standard of intermediate scrutiny. *See, e.g., Blankenship v. Bartlett*, 363 N.C. 518, 524, 681 S.E.2d 759, 764 (2009) (applying intermediate scrutiny to state constitutional challenge). Under the state intermediate scrutiny standard, school administrators must articulate an important or significant reason for denying students access to alternative education; however, the reasons supporting their decisions do not need to be compelling. *See, e.g., id.* at 526-27, 681 S.E.2d at 765-66 ("Judicial districts will be sustained if the legislature's formulations advance important governmental interests . . . ."). In the school disciplinary context, intermediate scrutiny strikes a practical balance between protecting student access to edu-

cational opportunities and empowering school officials to maintain safe and orderly schools.

State law requires local boards of education to establish at least one alternative learning program and create strategies for assigning long-term suspended students to it when feasible and appropriate. N.C.G.S. § 115C-47(32a). Since the General Assembly has chosen to grant this statutory right to long-term suspended students, school administrators cannot arbitrarily deny access without violating the state constitution. *See* N.C. Const. art. IX, § 2; *Leandro*, 346 N.C. at 347, 488 S.E.2d at 255; *Sneed*, 299 N.C. at 618, 264 S.E.2d at 113.

School administrators are not required to provide alternative education to every suspended student, especially those students who forfeit this statutory right through their own misbehavior. Because the safety and educational interests of all students receiving alternative education must be protected, students who exhibit violent behavior, threaten staff or other students, substantially disrupt the learning process, or otherwise engage in serious misconduct may be denied access. For these students, school officials will have little or no difficulty articulating an important or significant reason for denying access to alternative education under the state standard of intermediate review.

We believe considerations of fairness, institutional transparency, and public trust are generally best effectuated when government provides a reason for its denial of services. In the present case, defendants did not articulate any reason for denying plaintiff access to alternative education during her semester-long suspension. The record indicates only that plaintiff participated in "a fight involving numerous students" at Southside High School. Because the people of North Carolina "have a right to the privilege of education," N.C. Const. art. I, § 15, the requirement that school administrators articulate an important or significant reason for denying educational services is not unduly burdensome.

Even though defendants may have concluded plaintiff's violent behavior made her a threat to students and staff if she were placed in an alternative learning facility, it is not the role of this Court to speculate why plaintiff was denied alternative education. Nevertheless, when defendants suspended plaintiff for misbehavior they did not have the benefit of this Court's harmonization of our decision in *Leandro* with the standards of review applicable to school discipline cases. *Cf. State v. McDowell*, 310 N.C. 61, 74, 310 S.E.2d 301, 310

(1984) (ordering remand where the trial court could not have been aware of the correct legal standard), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 732 (1986), *overruled on other grounds by McDowell v. Dixon*, 858 F.2d 945 (4th Cir. 1988), *cert. denied*, 489 U.S. 1033, 103 L. Ed. 2d 230 (1989). Accordingly, on remand, defendants should be afforded the opportunity to explain why they denied plaintiff access to alternative education.

We therefore reverse the decision of the Court of Appeals and remand this case to that court for further remand to the trial court for additional proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice TIMMONS-GOODSON concurring in part and dissenting in part.

No school system in the State of North Carolina can deprive students of all state-funded educational opportunities, unless it is absolutely necessary. I believe the Constitution of North Carolina and precedent from this Court made this guarantee to the children of our state. Today's decision retreats from that promise. Because I would hold the right to education to be a fundamental right that is indivisible and not subject to parceling, I disagree with today's decision.

Viktoria King was a sophomore at Southside High School in Beaufort County during the 2007-2008 school year. On 18 January 2008, multiple fights broke out among students after dismissal of school, including one allegedly between Viktoria and another student. For her involvement in the fight, Viktoria was suspended for five months, the remainder of the school year. The Beaufort Superintendent subsequently denied her, without explanation, access to all public educational options.

The question presented to this Court is whether Viktoria King's complaint was sufficient to withstand a motion to dismiss. Viktoria claims that her constitutional right to a sound basic education was violated by depriving her of all state-funded educational opportunities during her long-term suspension. Because her alleged facts, if proved, would establish the violation of a fundamental right, I agree with the decision to reverse the opinion of the Court of Appeals upholding dismissal of Viktoria's claim.

I disagree, however, with the majority's application of intermediate scrutiny. The North Carolina Constitution and precedent

from this Court firmly establish for every child of this state a constitutionally-rooted fundamental right to the opportunity for a sound basic education. Accordingly, a purported violation of this right, including the cessation of all state-funded educational services, should be strictly scrutinized.

When presented with a Rule 12(b)(6) motion to dismiss, the question is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some [recognized] legal theory." *Isenhour v. Hutto*, 350 N.C. 601, 604, 517 S.E.2d 121, 124 (1999) (alteration in original) (citation and internal quotation marks omitted); N.C.G.S. § 1A-1, Rule 12(b)(6) (2009). Dismissal under Rule 12(b)(6) is proper when either "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Wood v. Guilford Cty.*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002) (citation omitted). "In ruling upon such a motion, the complaint is to be liberally construed . . . ." *Shepard v. Ocwen Fed. Bank*, 361 N.C. 137, 139, 638 S.E.2d 197, 199 (2006) (quoting *Meyer v. Walls*, 347 N.C. 97, 111, 489 S.E.2d 880, 888 (1997)).

In her complaint, plaintiff invokes the fundamental right to an opportunity for a sound basic education. Our North Carolina Constitution guarantees that "[t]he people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. In addition, Article IX is exclusively dedicated to education, whose importance is described in the very first section: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged." *Id.* art. IX, § 1. Not coincidentally, this right to education appears beside other indisputably fundamental rights, such as religious liberty, freedom of speech and press, and freedom from *ex post facto* laws. *Id.* art. I, §§ 13, 14, 16.

In light of the emphasis that the framers of the North Carolina Constitution placed on education, this Court has recognized our constitution to establish the right to an opportunity for a sound basic education. And until today, the Court has never parsed this right to give it varying levels of protection depending on the context. Thirty years ago, in *Sneed v. Greensboro City Board of Education*, this Court concluded that "equal access to participation in our public

school system is a *fundamental right*, guaranteed by our state constitution and protected by considerations of procedural due process." 299 N.C. 609, 618, 264 S.E.2d 106, 113 (1980) (emphasis added) (holding the right to attend school could not be made contingent on the ability to pay). We reaffirmed this right in *Leandro v. State*, declaring that the North Carolina Constitution confers upon "every child . . . *a fundamental right to a sound basic education* which would prepare the child to participate fully in society as it existed in his or her lifetime." 346 N.C. 336, 348, 488 S.E.2d 249, 255 (1997) (emphasis added).

Again in *Hoke County Board of Education v. State*, this Court understood our constitution and *Leandro* to confer on each child an "individual right of an opportunity to a sound basic education." 358 N.C. 605, 617, 599 S.E.2d 365, 378 (2004) (according this right "to all children . . ., regardless of their respective ages or needs," *id.* at 172, 675 S.E.2d at 350). And as recently as last year, we considered the right to education fundamental yet again, stating, "The general and uniform system of public schools indicates a fundamental right to a sound basic education." *Wake Cares, Inc. v. Wake Cty. Bd. of Educ.*, 363 N.C. 165, 172-73, 675 S.E.2d 345, 350-51 (2009) (citation omitted) (internal quotation marks omitted) (allowing the assignment of students to year-round schools without parental consent). The majority and I agree that our case law recognizes a fundamental right to the opportunity for a sound basic education, but we part ways when it comes to splintering that right.

Put simply, the right to education is indivisible and cannot cease to be fundamental. *See District of Columbia v. Heller*, 554 U.S. 570, ___, 171 L. Ed. 2d 637, 683 (2008). "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* None of the preceding cases contains any suggestion that the fundamental right to the opportunity for a sound basic education is limited to any particular context. As a result, I would hold this right to protect students from a complete termination of state-funded educational services during long-term suspensions. To hold otherwise would allow schools to grant every child an equal opportunity to enter school and then deprive them of all public education when it is less than necessary to do so.

The framers of our constitution and justices of this Court have held the right to the "privilege of education" to be of fundamental interest to the well-being of this state, as education prepares "stu-

dents to participate and compete in the society in which they live and work." *Leandro*, 346 N.C. at 345, 488 S.E.2d at 254. Indeed, the right to public education is a cornerstone of our democracy. For these reasons, I decline to segment the constitutionally mandated "privilege of education" in this state. Education is an indivisible fundamental right, and it remains so in the context of long-term suspensions.

Because we are dealing with a fundamental right, strict scrutiny is the appropriate standard of review to determine whether that right has been unconstitutionally infringed by a government action. *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 180, 594 S.E.2d 1, 15 (2004); *State ex rel. Utils. Comm'n v. Carolina Util. Customers Ass'n, Inc.*, 336 N.C. 657, 681, 446 S.E.2d 332, 346 (1994); *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980). In fact in *Leandro*, which involved a challenge to disparate funding of local school systems that resulted in discrepancies in academic and extracurricular opportunities, this Court applied strict scrutiny. Under that analysis, when a fundamental right to a sound basic education is interfered with, the State must show that the interference is "necessary to promote a compelling governmental interest." *Leandro*, 346 N.C. at 357, 488 S.E.2d at 261 (citation and quotation marks omitted). Further, a State action infringing upon "the exercise of a fundamental right" must be "narrowly tailored." *Stephenson v. Bartlett*, 355 N.C. 354, 377, 562 S.E.2d 377, 393 (2002) (citations and quotation marks omitted). The application of strict scrutiny also shifts the burden of proof, requiring the governmental entity to prove that infringement of the right was necessary to further a compelling state interest. *Leandro*, 346 N.C. at 357, 488 S.E.2d at 261 (citation omitted).

No participant in this appeal suggests that local boards of education lack a compelling interest in ensuring safe and orderly schools. No one disputes that this compelling governmental interest operates in every long-term suspension or expulsion for fighting, other violent behavior, or any conduct that threatens the orderly administration of the schools. *Cf. Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507, 21 L. Ed. 2d 731, 738 (1969) (recognizing the "comprehensive authority" of school officials to control conduct in the schools within "fundamental constitutional safeguards"). Accordingly, strict scrutiny only requires school administrators to consider whether a long-term suspension or expulsion *without some alternative educational option* is necessary to achieve safety and order. If denial of an alternative education program is not necessary to fur-

ther a compelling state interest, then such action is not narrowly tailored and must be reversed.

In other words, if it is possible to provide a student who has infringed a school rule with some form of education without jeopardizing the safety of others, then that opportunity should be provided. If a safe and orderly school environment can be maintained without barring a student from every single state-funded educational service, then such a barrier should not be erected.

The analysis now turns to whether plaintiff has alleged facts that, "treated as true, state a claim upon which relief can be granted." *Wood*, 355 N.C. at 166, 558 S.E.2d at 494 (citing *Isenhour*, 350 N.C. at 604, 517 S.E.2d at 124). First, plaintiff sufficiently alleges interference with her fundamental right to an opportunity for education. Complete termination of educational services from January 18 until the end of the school year interferes with this fundamental right.

Plaintiff further alleges that this complete deprivation of all educational services was unnecessary and therefore not narrowly tailored. Both parties agree that defendants did not provide a reason for denying plaintiff access to any alternative education program during her suspension. It is also undisputed that plaintiff was denied access to an alternative education program during her long-term suspension because of her participation in a fight.

What is still unclear, however, is the exact reasoning upon which defendants denied plaintiff access to an alternative school. Nevertheless, if it is true that plaintiff was suspended for fighting, and no other factors contributed to defendants' decision, then it was not necessary to deny plaintiff access to all educational services. It is unnecessary to the maintenance of a fruitful learning environment that *every* participant of *every* fight be both suspended *and* denied access to an alternative education program. Accordingly, plaintiff's factual allegations are sufficient to survive a motion to dismiss.

Since this appeal seeks review of a motion to dismiss, principles of judicial restraint do not allow this Court to determine whether defendants' decision to bar plaintiff from all alternative educational programs will actually withstand a strict scrutiny analysis. That analysis depends upon the strength of defendants' rationale for the decision as determined by the finder of fact. Indeed, defendants may prove it was necessary to deny plaintiff access to all educational services, *see* Adam Winkler, *Fatal in Theory and Strict in Fact: An*

*Empirical Analysis of Strict Scrutiny in the Federal Courts*, 59 Vand. L. Rev. 793, 862-71 (2006) (concluding that strict scrutiny, especially when fundamental rights are involved, is not always "fatal in fact" in federal cases), but this Court's role is not to prospectively define the contours of narrow tailoring. Our state constitution does not require a student to receive public educational services regardless of how dangerous that student is to the school population, but it does prohibit state interference with this right unless absolutely necessary to do so. Accordingly, while this Court has previously recognized the authority of school officials to punish and discipline students in order to maintain a safe and secure educational environment, such authority does not empower school officials to implement punishments that violate a student's constitutional rights. *See Tinker*, 393 U.S. at 513, 21 L. Ed. 2d at 741. At this stage, it will be for the trial court to decide whether the defendants' reasons for this denial are narrowly tailored and necessary to advance a compelling state interest.

Having explained why I agree with the majority that dismissal of plaintiff's claim was inappropriate, I now address my disagreement with the legal analysis put forth by the majority to support the application of intermediate scrutiny.

First, the majority opinion "does not recognize a state constitutional right to alternative education," but nonetheless goes on to consider the appropriate constitutional standard of review when a suspended student alleges an infringement of her "statutory right to alternative education." I find it novel to apply a *constitutional* standard of review to determine whether a *statute* has been violated. The majority seeks to "harmonize" the application of the rational basis test with the strict scrutiny test, citing various cases in which these tests were applied for the purpose of determining whether constitutional rights were violated by state action. However, the rational basis, intermediate scrutiny, and strict scrutiny standards of review traditionally have been applied to determine whether a government action violates individual rights having constitutional roots, not those created by statute. Classic examples of this application at the federal level include *Zablocki v. Redhail*, 434 U.S. 374, 54 L. Ed. 2d 618, (1978) (right to marry); *Roe v. Wade*, 410 U.S. 113, 35 L. Ed. 2d 147 (1973) (right to abortion); *Bullock v. Carter*, 405 U.S. 134, 31 L. Ed. 2d 92 (1972) (right to vote); *Shapiro v. Thompson*, 394 U.S. 618, 22 L. Ed. 2d 600 (1969) (right to interstate travel), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 39

L. Ed. 2d 662 (1974); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 86 L. Ed. 1655 (1942) (right to procreate). In North Carolina, this Court has also used these standards of review to evaluate constitutional claims. *Rhyne,* 358 N.C. at 180, 594 S.E.2d at 15 (due process and equal protection); *Leandro,* 346 N.C. at 348, 488 S.E.2d at 255 (quality of education); *Carolina Util. Customers Ass'n, Inc.,* 336 N.C. at 681, 446 S.E.2d at 346 (equal protection); *Sneed,* 299 N.C. at 618, 264 S.E.2d at 113 (access to education).

While the majority tries to resolve this problem by naming the constitutional hook of "equal educational access," this solution is based on a flawed syllogism. The majority acknowledges (1) that *Sneed* recognized the state constitutional right to equal educational access as a fundamental right, *Sneed,* 299 N.C. at 618, 264 S.E.2d at 113 ("[Equal access to participation in our public school system is a fundamental right . . . ."), and (2) that "exclusion from alternative education potentially infringes on a student's state constitutional right to equal educational access." Yet the majority somehow concludes merely that "school administrators must articulate a reason when they exclude a long-term suspended student from alternative education." In my view, this conclusion does not follow. The logically sound conclusion is that the exclusion from alternative education programs and all other educational services potentially infringes upon a fundamental right. As the majority agrees that interference with a fundamental right requires a strict scrutiny analysis, strict scrutiny should be applied in this case.

Second, even in the context of an alleged constitutional violation, intermediate scrutiny is the incorrect standard for determining whether the right to an opportunity to a sound basic education has been violated. Until today, this Court has uniformly applied strict scrutiny in cases involving the right to education. While the majority opinion relies on *Coggins ex rel. Coggins v. Board of Education* for the proposition that school disciplinary decisions are subject only to rational basis review, the student in *Coggins* only challenged limitations on his participation in "secret societies known as Greek letter fraternities," not a denial of all educational services. 223 N.C. 763, 768-69, 28 S.E.2d 527, 531 (1944). In fact, the challenged rule made "no attempt to deny plaintiff any instruction afforded by class work or by the required curriculum of the school." *Id.* at 769, 28 S.E.2d at 531. Thus, the reliance by the majority on *Coggins* is misplaced.

Partitioning the right to education into subcategories, each with a different standard of review, also has uncertain and unexplained

implications for what has long been considered a vested fundamental right of every North Carolina student. At best, the right to a sound basic education is transformed into a quasi-fundamental right in the student discipline context, *cf. Blankenship*, 363 N.C. at 526-27, 681 S.E.2d at 765-66 (holding that "the right to vote in superior court elections on substantially equal terms is a quasi-fundamental right" that is "reviewed under intermediate scrutiny"), and it remains fundamental in all other contexts. At worst, this decision has rewritten our constitution and overruled thirty years of precedent from this Court collectively establishing that the right to the opportunity for a sound basic education is fundamental. Whatever the precise parameters of today's holding, the intermediate scrutiny standard is incompatible with Article I, Section 15; Article IX; and three decades of precedent.

Equally troubling is that intermediate review, in practice, will be no more exacting than the exceedingly deferential rational basis standard, which requires only that the regulation be reasonably related to some conceivable legitimate end. *Standley v. Town of Woodfin*, 362 N.C. 328, 332, 661 S.E.2d 728, 731 (2008) (citations omitted). As noted above, school districts always have an important, indeed compelling, interest in maintaining safe and orderly schools. A denial of alternative educational opportunities will ordinarily be substantially related to maintaining safety and order simply because the offender is dissociated from the school environment. The majority essentially concedes this point, stating that "school officials will have little or no difficulty articulating an important or significant reason for denying access to alternative education." Thus, the intermediate standard of review will be toothless in the student discipline context and grossly inadequate to protect a fundamental right. I agree with the Supreme Court of the United States, which proclaimed, "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180, 33 L. Ed. 2d 266, 279 (1972) (citations and internal quotation marks omitted).

There also is no reason to believe that applying strict scrutiny would bring about the exaggerated consequences imagined by the majority. Strict scrutiny will not "immunize individuals from the consequences of their own misconduct," because at times, it may be necessary to remove a student from all state-funded public education to ensure the safety and order of all schools, traditional and alternative. *Cf. Tinker*, 393 U.S. at 513, 21 L. Ed. 2d at 741 (stating that a student's conduct that "materially disrupts classwork or involves substantial

disorder" is not "immunized by the constitutional guarantee of freedom of speech"). For the same reason, strict scrutiny review would not prohibit long-term suspensions. Strict scrutiny is satisfied on a showing that it is necessary to remove a long-term suspended or expelled student without an alternative educational option in order to maintain safety and discipline in the schools. To that end, plaintiff and her amici point out that alternative education need not take any particular form. Alternative learning options might include computer- and Internet-based learning programs. "[I]n all but the most extreme cases the State will be able to provide reasonable state-funded educational opportunities and services . . . . Under such circumstances, providing educational opportunities and services to [long-term suspended or expelled] children is constitutionally mandated." *Cathe A. v. Doddridge Cty. Bd. of Educ.*, 200 W. Va. 521, 532, 490 S.E.2d 340, 351 (1997) (footnote omitted).

Further, this case marks only the second time our Court has applied intermediate scrutiny, and it is the first application in a statutory context. *See Blankenship v. Bartlett*, 363 N.C. 518, 526, 681 S.E.2d 759, 765 (2009) (applying intermediate scrutiny when considering equal protection challenges to judicial districts allegedly drawn in violation of the N.C. Constitution and analogizing that controversy to federal cases considering challenges based on rights guaranteed under the First Amendment). I must note, however, that *Blankenship* adopted the intermediate standard of review from federal jurisprudence and *Plyler v. Doe. Id.* at 524-27, 681 S.E.2d at 764-66. In *Plyler*, the Court refused to apply strict scrutiny to Texas's withholding of free public education from the children of undocumented aliens, concluding that the right to education is only "quasi-fundamental" under the Federal Constitution, since that right is not expressly or impliedly guaranteed therein and the children were not a suspect class. *Plyler v. Doe*, 457 U.S. 202, 221-23, 72 L. Ed. 2d 786, 801-03 (1982). By contrast, this Court has already determined the right to the opportunity for a sound basic education to be fundamental. *Leandro*, 346 N.C. at 348, 488 S.E.2d at 255-56. For the above reasons the intermediate standard of review is inappropriate for student discipline decisions that infringe upon the fundamental right to the opportunity for a sound basic education.

In my view, if it is possible to provide a student with some form of educational services during her long-term suspension without jeopardizing the safety and security of others, then that opportunity must be provided. This Court should simply apply the North Carolina

Constitution as it is written and according to precedent from this Court. The complaint sufficiently alleges that defendants infringed plaintiff's fundamental right to the opportunity for a sound basic education by unnecessarily removing her from all public school educational options without an alternative educational option.

Because plaintiff sufficiently alleged deprivation of a fundamental right, I would reverse the decision by the Court of Appeals affirming the dismissal of plaintiff's complaint. Therefore, I concur with the majority decision to reverse the Court of Appeals and remand this matter to the trial court. I conclude, however, that strict scrutiny, not intermediate scrutiny, is the proper standard of review. Accordingly, I respectfully dissent from the analysis and holding of the majority as to the correct standard of review on remand.

Justice HUDSON joins in this opinion concurring in part and dissenting in part.

Justice NEWBY dissenting.

For over one hundred years, our courts have refrained from interfering with a disciplinary decision of our professional educators and elected officials unless that decision is shown to be irrational. Today's majority decision unnecessarily departs from that practice. While I agree with the general proposition that school officials ought not remove a student from the public school system unless they have a proper reason for doing so, I disagree with the majority's conclusion that our courts should second-guess our school officials' reasonable disciplinary decisions. Accordingly, I respectfully dissent.

Plaintiff was disciplined for her involvement in a fight at Southside High School on 18 January 2008. According to her complaint, such behavior is a violation of the Student Code of Conduct Policy for the Beaufort County Schools ("the Policy") and exposes her to a penalty of removal for up to ten days and a possible long-term suspension. Pursuant to the Policy, plaintiff was suspended for ten days and ultimately received a long-term suspension. Plaintiff filed a statutory administrative appeal, but her suspension was upheld.

Now plaintiff asserts a claim that the North Carolina Constitution mandates that she have access to an alternative education program while she is under long-term suspension.[1] In her complaint plaintiff

---

1. Plaintiff also alleged in the trial court that the statute under which she was excluded from school is unconstitutional, but she has since abandoned that claim.

precisely contended that she has a fundamental right to "the opportunity to obtain a sound, basic education." She alleged that defendants denied her that fundamental right by suspending her "through the end of the school year and den[ying] her any access to educational services during her suspension." She argued that the denial was unconstitutional unless defendants "demonstrate that the denial is necessary to promote a compelling governmental interest." Plaintiff sought injunctive and declaratory relief specifically tailored to this claim.

The trial court dismissed plaintiff's claim. The trial court determined, *inter alia*, that plaintiff's claim should be dismissed under Rule 12(b)(6) because her allegations "fail to state a claim upon which relief may be granted." The court provided three alternative grounds for its dismissal under Rule 12(b)(6). First, the court explained that the statutory administrative appeal afforded by our legislature to students under long-term suspension is an adequate state law remedy precluding plaintiff's direct action under the North Carolina Constitution. Second, the court reasoned that defendants' decision to deny plaintiff access to an alternative education program is not subject to strict scrutiny, and, relying on precedent from the Court of Appeals, concluded that there is "no affirmative duty to provide" access to such programs "absent a legislative mandate." Third, the court stated that even if strict scrutiny were the appropriate standard, school officials may lawfully temporarily halt the provision of educational services, as occurred here.

The Court of Appeals affirmed the trial court's decision to dismiss plaintiff's claim under Rule 12(b)(6). *King ex rel. Harvey-Barrow v. Beaufort Cty. Bd. of Educ.*, ——N.C. App. ——, ——, 683 S.E.2d 767, 771 (2009). The Court of Appeals majority concluded that school disciplinary decisions are not subject to strict scrutiny. *See id.* at ——, 683 S.E.2d at 770-71. Rather, that court relied upon its prior decision in *In re Jackson*, 84 N.C. App. 167, 352 S.E.2d 449 (1987), which held that school disciplinary decisions are subject to rational basis review. *King*, —— N.C. App. at ——, 683 S.E.2d at 770-71. The dissenting judge reasoned that our opinion in *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997), required that the decision denying plaintiff access to an alternative education program be subjected to strict scrutiny and concluded that plaintiff had adequately stated a claim. —— N.C. App. at ——, 683 S.E.2d at 772-73 (Geer, J., dissenting).

In my view, the Court of Appeals properly affirmed the trial court's dismissal of plaintiff's claim. As the majority observes, there

is no fundamental, constitutional right to an alternative education program. Our precedent indicates that our courts review school disciplinary decisions for a rational basis. Because plaintiff has not alleged that defendants arbitrarily denied her access to an alternative education program, I would affirm the decision of the Court of Appeals.

We have historically refrained from intruding upon the reasonable disciplinary decisions of our local school officials. *See Hutchins v. [Sch. Comm. of] Durham*, 137 N.C. 78, 80, 137 N.C. 68, 70-71, 49 S.E. 46, 47 (1904) (citations omitted). For example, in *Coggins ex rel. Coggins v. Board of Education*, 223 N.C. 763, 769, 28 S.E.2d 527, 531 (1944), we explained that courts review school board disciplinary rules for "unreasonableness" and will intervene when faced with a "clearly arbitrary or unreasonable" regulation. *Id.* Aside from "the unreasonableness of such a rule," we stated that complaints about disciplinary decisions of our local school officials "raise questions essentially political in nature, and the remedy, if any, is at the ballot box." *Id.* As the majority notes, our historical deference accords with the practice in almost all our sister states.

Our recent decisions in *Hoke County Board of Education v. State*, 358 N.C. 605, 599 S.E.2d 365 (2004), and *Leandro* left intact the deference afforded the disciplinary decisions of school officials. In *Hoke County* and *Leandro* we elucidated our children's fundamental right under the state constitution to a qualitatively sound basic education. *Hoke Cty.*, 358 N.C. at 609, 599 S.E.2d at 373; *Leandro*, 346 N.C. at 346, 488 S.E.2d at 254 (citation omitted). We applied strict scrutiny to the alleged violations of that right in those cases. *Hoke Cty.*, 358 N.C. at 609, 599 S.E.2d at 373; *Leandro*, 346 N.C. at 357, 488 S.E.2d at 261 (citation omitted). However, as the majority illustrates, there is a fundamental distinction between our schools failing to afford a qualitatively sound education and disciplining students following their misbehavior. Accordingly, *Hoke County* and *Leandro* did not raise the level of scrutiny to which we subject the disciplinary decisions of our local school officials.

The courts' limited role in disciplinary matters safeguards the constitutional province of our coordinate branches of government. The people of this state have vested control and management of our public schools in the legislative and executive branches of our government. N.C. Const. art. IX, §§ 2(1), 5; *see also Leandro*, 346 N.C. at 357, 488 S.E.2d at 261 ("[T]he administration of the pub-

KING v. BEAUFORT CTY. BD. OF EDUC.

[364 N.C. 368 (2010)]

lic schools of the state is best left to the legislative and executive branches of government.").

Those branches have constructed a detailed scheme by which to operate our public schools so as to protect the schools' paramount mission: education. To promote academic achievement by all students, our General Assembly has determined that "all schools should be safe, secure, and orderly." N.C.G.S. § 115C-105.45 (2009). Accordingly, the legislature has required local school boards to adopt plans designed to maintain safety, *id.* § 115C-105.47(a) (2009), and "policies . . . governing the conduct of students," *id.* § 115C-391(a) (2009). A student may be removed from our schools for a willful violation of the local school board's policies governing conduct, subject to numerous procedural safeguards. *Id.* § 115C-391(c) (2009).

Students receive a myriad of procedural protections to guard against an erroneous determination of a school policy violation and the arbitrary imposition of discipline. The General Assembly has provided for several levels of review of a long-term suspension decision. *See id.* (requiring that a school principal and superintendent act together in issuing a long-term suspension); *id.* § 115C-391(e) (2009) (allowing a decision to issue a long-term suspension to be appealed to the local school board and making that decision subject to judicial review under Article 4 of Chapter 150B of the General Statutes). Like the board in Beaufort County, many local school boards have provided another level of procedural protection by allowing for an initial review hearing before a panel of central office administrators. The parent of a student recommended for expulsion or long-term suspension must also be given written notice of the proposed action. *Id.* § 115C-391(d5) (2009) (requiring the notice to contain information on the student's conduct, the school's conduct policy, the hearing process, the right to have an attorney represent the student, whether an advocate other than an attorney may assist the student, and the parent's right to review the student's school records). These procedural protections ensure that a student will not be subjected to the possibility of being excluded from all educational opportunities unless that student has actually committed a willful violation of school policy.

For those students found to have violated local school board policies, the General Assembly has provided for potential additional educational opportunities, despite no constitutional obligation to do so. Each local school board must create one alternative education program and adopt "guidelines for assigning students to" it. *Id.*

§ 115C-47(32a) (2009). As the majority notes, the General Assembly has allowed local school boards to determine when it is "feasible and appropriate" to assign students subject to long-term suspension to the local school board's alternative education program. *Id.*

The statutory structure enacted by the General Assembly affords local school officials flexibility in managing our public schools. That flexibility demonstrates a recognition that denial of admission to an alternative education program may act as an additional deterrent against disruptive behavior in our public schools. Further, it may serve to maintain a safe and orderly environment in an alternative school, especially in a case like the one presently before the Court in which numerous students were involved in a violent disturbance. Also, the legislature appears to understand that mandating alternative education, whether that means admission to an alternative school or participation in some other learning program, tailored to every student who has willfully violated school board policy could devour the already scarce resources available to our schools to provide all our children the opportunity to obtain a sound basic education. *See Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 501-02, 681 S.E.2d 278, 280 (2009) (illustrating the funding challenges facing our local boards of education).

Using its immense "history and expertise" in education, *Hoke Cty.*, 358 N.C. at 645, 599 S.E.2d at 395, our General Assembly has, along with the various local school boards, accomplished a considerable task. As required when administering discipline in our schools, the political branches of our government have balanced divergent interests—including the misbehaving student's interest in obtaining an education, other students' interests in having an unimpeded opportunity to obtain an education, and the interests of all students, teachers, and administrators to interact in a safe environment—with, *inter alia*, scarce financial, human, and capital resources. *See Hoke Cty.*, 358 N.C. at 620, 599 S.E.2d at 379 (clarifying that the constitutional right we articulated in *Leandro*, the right to the opportunity to receive a sound basic education, is vested in all this state's children).

To maintain this balance this Court should, as it has historically done, give reasonable deference to our coordinate branches of government and the professional educators and administrators retained to manage our public schools. Rational basis review gives appropriate deference while simultaneously ensuring that there is a legitimate

**KING v. BEAUFORT CTY. BD. OF EDUC.**

[364 N.C. 368 (2010)]

reason for a student's exclusion, allowing our school officials to administer our schools free of judicial micromanagement. On the other hand, under intermediate and strict scrutiny school officials must establish both the reason for their decision and that their reason is appropriately weighty. Such requirements unduly burden our school officials and place our trial courts in the position of second-guessing their decisions. Accordingly, the judicial branch should not determine whether school officials' reason for denying a student access to alternative education as a disciplinary matter is "important" or "significant," as opposed to "reasonable." Such an intrusion will weigh heavily on both our courts and our schools. *Coggins*, 223 N.C. at 769, 28 S.E.2d at 531.

To be sure, there is much in the majority's decision with which I agree. Initially, the majority correctly determines "that a fundamental right to alternative education does not exist under the state constitution." Additionally, the majority properly recognizes that our constitution affords a right to equal educational access. However, I disagree that the equal educational access provision of our constitution mandates that plaintiff be told the reason for her exclusion from an alternative education program, a remedy she failed to request. Perhaps if plaintiff had alleged defendants treated her differently than those similarly situated because of some immutable characteristic, then our constitution would afford heightened scrutiny of defendants' decision. But that is not the case before us.

In my view, today's decision has altered the administrative framework established for our public schools by our constitution and our General Statutes. Plaintiff here concedes that defendants complied with all statutory obligations in the handling of her long-term suspension. Nonetheless, after today's decision our local school boards and administrators have less control and flexibility in making disciplinary decisions than that granted to them by our legislature. Because I see no justification to depart from our well-settled precedent subjecting school disciplinary decisions to rational basis review, and because plaintiff did not allege defendants arbitrarily denied her access to an alternative education program, I would affirm the decision of the Court of Appeals concluding that the trial court properly dismissed plaintiff's claim. Accordingly, I respectfully dissent.