IN THE SUPREME COURT OF NORTH CAROLINA

No. 338A17

Filed 21 December 2018

LATONYA SILVER, individually and as guardian ad litem of BRIANNA SILVER, LARRY SILVER III, and DOMINICK SILVER; BRENDA SLEDGE, individually and as guardian ad litem of ALICIA JONES; FELICIA SCOTT, individually and as guardian ad litem of JAMIER SCOTT; HALIFAX COUNTY BRANCH #5401, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; and COALITION FOR EDUCATION AND ECONOMIC SECURITY

v.

THE HALIFAX COUNTY BOARD OF COMMISSIONERS

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, ___ N.C. App. ___, 805 S.E.2d 320 (2017), affirming an order entered on 2 February 2016 by Judge W. Russell Duke, Jr. in Superior Court, Halifax County. Heard in the Supreme Court on 16 April 2018.

*Mark Dorosin and Elizabeth Haddix for plaintiff-appellants.*

*Garris Neil Yarborough and M. Glynn Rollins, Jr. for defendant-appellee.*

*Jane R. Wettach for Children's Law Clinic, Duke University School of Law; Youth Justice Project of the Southern Coalition for Social Justice, by Peggy Nicholson and K. Ricky Watson, Jr., for Public Schools First NC; and Celia Pistolis, Aisha Forte, and Jennifer Story for Legal Aid of North Carolina, Inc. – Advocates for Children's Services, amici curiae.*

*Tin Fulton Walker & Owen, PLLC, by S. Luke Largess and Cheyenne N. Chambers, for North Carolina Advocates for Justice, amicus curiae.*

*Womble Bond Dickinson (US) LLP, by Beth Tyner Jones, Rebecca C. Fleishman, and Matthew Tilley, for North Carolina Association of County Commissioners, amicus curiae.*

JACKSON, Justice.

In this case we consider whether plaintiffs have stated a claim for violations of their right to receive the sound basic education guaranteed by the North Carolina Constitution sufficient to survive defendant's motion to dismiss pursuant to North Carolina Rule of Civil Procedure 12(b)(6). *See* N.C.G.S. § 1A-1, Rule 12(b)(6) (2017). Because we conclude that the State—and not a board of county commissioners—is solely responsible for guarding and preserving the right of every child in North Carolina to receive a sound basic education pursuant to the North Carolina Constitution, we affirm the decision of the Court of Appeals.

The case sub judice is related to, yet distinguishable from, this Court's landmark decision in *Leandro v. State*, 346 N.C. 336, 488 S.E.2d 249 (1997) (*Leandro I*). The plaintiffs in *Leandro I* were students, parents or their legal guardians, and local boards of education from five relatively low wealth counties.[1] One of the plaintiffs was Halifax County Public Schools, a local board of education which is one of the school systems relevant to this case but is not a party. The plaintiffs in *Leandro I* sued the State and the North Carolina State Board of Education alleging that their state constitutional rights relating to education were being violated. *Id.* at 342, 488 S.E.2d at 252. They sought declaratory and injunctive relief to secure their right to

---

[1] *Leandro I* also featured a number of plaintiff-intervenors, who were students and their parents or legal guardians from relatively large and wealthy counties and those counties' respective boards of education.

fundamental educational opportunities that were severely lacking allegedly due to inadequate funding from the State. *Id* at 342, 488 S.E.2d at 252. In *Leandro I* we concluded that "Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools" and that this includes a right to a qualitatively adequate education.[2] *Id.* at 347, 488 S.E.2d at 255. We remanded the case to the trial court for a determination of whether the defendants in that case had violated their constitutional duty to provide every child an opportunity to receive a sound basic education, with instructions to the trial court to provide declaratory or other relief if it was found that they had violated this duty. *Id.* at 357-58, 488 S.E.2d at 261. Seven years later, the case returned to this Court in *Hoke County Board of Education v. State*, 358 N.C. 605, 599 S.E.2d 365 (2004) (*Leandro II*). This Court

---

[2] In so doing, we noted that a qualitative "sound basic education" is one that would provide students with at least:

> (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.

*Leandro I*, 346 N.C. at 347, 488 S.E.2d at 255 (citations omitted).

reviewed, among other things, the trial court's order on remand, which found that the State had failed to meet its constitutional duties regarding education outlined in *Leandro I* by inefficiently allocating and spending funds for education and directed the State to remedy the deficiencies that caused this violation. *Id.* at 608-09, 647-48, 599 S.E.2d at 372-73, 396. We affirmed the trial court's order, which left to the State the "nuts and bolts" of educational resource expenditures as they relate to providing a sound basic education while generally instructing the State to "assume the responsibility for, and correct, those educational methods and practices that contribute to the failure to provide students with a constitutionally-conforming education." *Id.* at 609, 599 S.E.2d at 373.

According to the factual allegations in plaintiffs' complaint, which we take as true for the purpose of reviewing an order on a motion to dismiss pursuant to Rule 12(b)(6), *see Krawiec v. Manly*, 370 N.C. 602, 604, 811 S.E.2d 542, 545 (2018) (citing *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 442, 666 S.E.2d 107, 114 (2008)), plaintiffs are five children who live and attend school in Halifax County, their respective parents or legal guardians, and two interested organizations: the local branch of the National Association for the Advancement of Colored People and the Coalition for Education and Economic Security. Defendant is the Halifax County Board of Commissioners, which, plaintiffs allege, is required by the North Carolina statutes to provide funding for each of the three local boards of education in

Halifax County and is authorized to maintain or supplement school programs, facilities, and equipment for the local school boards.

In contrast to most North Carolina counties that have just one local education area (LEA), Halifax County has three: Halifax County Public Schools (HCPS), Weldon City Schools (WCS), and Roanoke Rapids Graded School District (RRGSD). According to plaintiffs' complaint, in the 2014 to 2015 school year, the student populations of HCPS and WCS were overwhelmingly black, with HCPS's student population of 2988 schoolchildren 85% black and 4% white, and WCS's student population of 940 students 94% black and 4% white. At the same time, RRGSD's student population of 2929 schoolchildren was only 26% black and 65% white. Furthermore, the vast majority of students attending school in HCPS and WCS schools are considered "at risk." Our decision in *Leandro II* recognized that students may be considered "at risk" if, "due to circumstances such as an unstable home life, poor socio-economic background, and other factors, [they] either enter or continue in school from a disadvantaged standpoint, at least in relation to other students who are not burdened with such circumstances."[3] *Leandro II*, 358 N.C. at 632 n.13, 599 S.E.2d at 387 n.13.

---

[3] In expounding upon the definition of an "at risk" student in *Leandro II*, we noted that an "at risk" student generally

> holds or demonstrates one or more of the following characteristics: (1) member of low-income family; (2) participate in free or reduced-cost lunch programs; (3) have parents with a low-level education; (4) show limited proficiency in

The facts alleged in plaintiffs' complaint are, unfortunately, all too familiar to this Court, as they mirror those of the plaintiffs in *Leandro I*. Plaintiffs allege that defendant's continued support and maintenance of this tripartite school district system and its refusal to manage and distribute resources efficiently among the school districts has resulted in defendant's failure to provide the students of Halifax County an opportunity to receive a sound basic education. They compare defendant's "inputs" and "outputs"[4] in the HCPS and WCS districts with those in RRGSD to bolster their allegations. As to "inputs," plaintiffs state that HCPS and WCS school buildings and facilities are woefully inadequate, with crumbling infrastructure and regularly failing heating and cooling systems. Plaintiffs also include a report that students at Northwest High School in HCPS recently have had to walk through sewage to move between classes because of defective plumbing. In addition, HCPS and WCS school students frequently lack textbooks and other basic curricular

---

English; (5) are a member of a racial or ethnic minority group; (6) live in a home headed by a single parent or guardian.

358 N.C. at 636 n.16, 599 S.E.2d at 389 n.16.

[4] In the *Leandro* cases we used these terms as shorthand for various actions the State takes and the results it achieves, in educational policy to help determine whether it was providing a sound basic education. The term "inputs" includes indicators like the amount of funding received and its allocation, educational programs and opportunities provided to students, teacher certification standards, and overall quality of administrators and teachers. *Leandro II*, 358 N.C. at 631-32, 599 S.E.2d at 386-87. The term "outputs" generally is considered to measure overall student performance, and includes indicators such as comparative standardized test score data, student graduation rates, employment potential, and post-secondary education success (or a lack of post-secondary education participation). *Id.* at 623, 599 S.E.2d at 381.

materials, with teachers relying on donations from parents to purchase books and other basic classroom necessities. Meanwhile, plaintiffs point out that the facilities at RRGSD schools are well kept and regularly renovated, and students have access to Advanced Placement classes and many other curricular and extra-curricular activities that are not available to HCPS and WCS students. Plaintiffs argue that funding disparities make it extremely difficult for HCPS and WCS to attract and retain quality, or even fully licensed, teachers and administrators, with these schools commonly resorting to hiring teachers from the Teach for America program or teachers with little or no experience. The percentage of fully licensed teachers in these districts ranges from 63 to 89%. In contrast, 95 to 100% of the teachers in RRGSD schools are fully licensed.

Plaintiffs claim this disparity in inputs is largely attributable to the way defendant has structured its system of local sales tax distribution pertaining to education. Pursuant to legislation enacted by the General Assembly, each year defendant selects one of two methods by which local sales tax revenues are distributed within the county to provide additional funding to the local school districts. Defendant may use either the per capita method, in which local sales tax revenue is divided between defendant and all municipalities within the county on a per capita basis using the resident population of each, N.C.G.S. § 105-472(b)(1) (2017), or the ad valorem method, in which local sales tax revenue is divided between all "taxing entities" in the county, including municipalities and eligible LEAs, *id.* §

105-472(b)(2) (2017). Defendant routinely chooses to employ the ad valorem method, which plaintiffs allege netted RRGSD $4.5 million in local sales and use tax revenue and WCS $2.5 million in local sales and use tax revenue between 2006 and 2014. HCPS, which does not have a supplemental property tax and is therefore not a taxing entity, receives no money pursuant to the ad valorem method of distribution. Plaintiffs claim that defendant's continued use of the ad valorem method, as opposed to the per capita method, routinely leaves HCPS with fewer resources to increase "inputs" and exacerbates existing funding disparities, which in turn reduces the chance that students in HCPS schools will receive a sound basic education. Differing supplemental property tax rates similarly result in disparate funding between the three LEAs within the county.

Plaintiffs' complaint also alleges large disparities in "outputs." Plaintiffs point out that since 2002, the students in HCPS and WCS schools have scored anywhere from 15 to 30% lower than students in RRGSD schools on end-of-course tests and that a majority of students in HCPS and WCS schools score below grade level in standardized statewide end-of-grade exams. HCPS and WCS students consistently score 150 to 250 points lower than RRGSD students on the SAT college entrance exam. Students in HCPS and WCS schools are much more likely than students in RRGSD schools to be suspended, with HCPS having suspended a higher percentage of high school students than any other school district in the state during the 2013 to 2014 school year.

In August 2016, plaintiffs commenced this action alleging that defendant has violated plaintiffs' fundamental constitutional right to receive the sound basic education guaranteed in Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution. Plaintiffs requested that the trial court issue a declaratory judgment and use its equitable powers to order defendant to develop and implement a plan to cure the alleged violation. Defendant filed a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In February 2016, the trial court granted defendant's motion to dismiss, noting that no provision of the North Carolina Constitution affirmatively requires a board of county commissioners to implement and maintain a public education system in the county in which it sits, thereby absolving the board of any constitutional duty to provide its students the opportunity to receive a sound basic education. Plaintiffs appealed to the Court of Appeals, asserting that defendant is constitutionally responsible for securing a child's right to a sound basic education. After reviewing the plain language of our constitution and our decisions in the *Leandro* cases, the Court of Appeals affirmed the decision of the trial court in a divided decision, holding that the State, standing alone, has the obligation to provide a sound basic education to the children of North Carolina. *Silver v. Halifax Cty. Bd. of Comm'rs*, ___ N.C. App. ___, ___, 805 S.E.2d 320, 323 (2017). The Court of Appeals determined that plaintiffs' correct course of action would be to have their concerns addressed in the ongoing *Leandro* proceedings. *Id.* at ___, 805 S.E.2d at 329-330. Chief Judge McGee dissented, writing

that she would hold that plaintiffs have properly stated a claim against defendant and that a board of county commissioners may be held responsible for ensuring that schoolchildren have the opportunity to receive a sound basic education. *Id.* at ___, 805 S.E.2d at 344 (McGee, C.J., dissenting). Chief Judge McGee reasoned that the responsibility for providing the right to a sound basic education is the result of the assignment of powers over education to a local entity by the General Assembly pursuant to Article IX, Section 2(2). *Id.* at ___, 805 S.E.2d at 345 (McGee, C.J., dissenting). In October 2017, plaintiffs appealed to this Court as of right pursuant to N.C.G.S. § 7A-30(2) to obtain review of the Court of Appeals' determination that the trial court appropriately dismissed their complaint.

On appeal from an order dismissing a claim pursuant to Rule 12(b)(6), we conduct de novo review. *Krawiec*, 370 N.C. at 606, 811 S.E.2d at 546 (citing *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 448, 781 S.E.2d 1, 8 (2015)). An action will be dismissed pursuant to Rule 12(b)(6) if the complaint "[f]ail[s] to state a claim upon which relief can be granted." N.C.G.S. § 1A-1, Rule (12)(b)(6). We have determined that a complaint fails to state a claim and will be dismissed when: "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Krawiec*, 370 N.C. at 606, 811 S.E.2d at 546 (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)). In conducting our review of a complaint

dismissed pursuant to Rule 12(b)(6), we take all of the factual allegations stated in plaintiffs' complaint as true. *Id.* at 604, 811 S.E.2d at 545 (citing *Ridgeway Brands*, 362 N.C. at 442, 666 S.E.2d at 114).

The trial court dismissed plaintiffs' constitutional claim for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) on the basis that plaintiffs could not have their constitutional rights enforced by defendant because defendant does not possess any constitutional duties relating to public education. Plaintiffs contend that, along with the State, a board of county commissioners is obliged to provide the opportunity for the children of North Carolina to receive a sound basic education. We disagree.

In analyzing defendant's constitutional duties with respect to providing a sound basic education, first we must carefully consider the pertinent language of the constitution itself. Section 15 of the North Carolina Declaration of Rights states: "The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. Const. art. I, § 15. The provision more relevant to the case sub judice, Article IX, Section 2, entitled "Uniform system of schools" states:

> (1) General and uniform system: term. — The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.

> (2) Local responsibility. — The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate. The governing boards of units of local government with financial responsibility for public education may use local revenues to add to or supplement any public school or post-secondary school program.

*Id.* art. IX, § 2. Acting together, these two sections of Article I and Article IX create a mandate that guarantees every child in the state the opportunity to receive a sound basic education. We interpret our constitution and our statutes in the same manner, meaning that if the language in the instrument is clear and unambiguous on its face, we do not search for meaning elsewhere. *State ex rel. Martin v. Preston,* 325 N.C. 438, 449, 385 S.E.2d 473, 478-79 (1989) (citing *Elliott v. State Bd. of Equalization,* 203 N.C. 749, 753, 166 S.E. 918, 920-21 (1932)).

As we read these provisions of our constitution, it is clear that no express provision requires boards of county commissioners to provide for or preserve any rights relating to education. Section 2(1) of Article IX requires the General Assembly to create and maintain a system of free public schools. N.C. Const. art. IX, § 2(1) ("The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools . . . ."). The constitution also notes expressly that units of local government, such as county boards of commissioners, may bear the burden for some of the financial needs of local education by using local revenues if the General Assembly so allows. *Id.* art. IX, § 2(2) ("The General Assembly may

assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate."). Indeed, the General Assembly has chosen to enact many statutes making county boards of commissioners responsible for certain costs associated with LEA operations. *See, e.g.*, N.C.G.S. § 115C-408(b) (2017) ("[T]he facilities requirements for a public education system will be met by county governments."); *id.* §§ 115C-521(b), -524(b) (2017) (requiring boards of commissioners to provide funds for the erection of "school buildings equipped with suitable school furniture and apparatus" and to ensure that these buildings are in "good repair" and "at all times in proper condition for use"); *id.* § 115C-522(c) (2017) (making it the combined duty of boards of county commissioners and local school boards "to provide suitable supplies for the school buildings . . . . includ[ing] . . . proper window shades, blackboards, reference books, library equipment, maps, and equipment for teaching the sciences" as well as "provide every school with a good supply of water"). Furthermore, the legislature gives boards of county commissioners the option to supplement monies for public education with certain taxes if they choose to do so. *Id.* § 105-464 (2017) (affording "the counties and municipalities of this State with opportunity to obtain an added source of revenue . . . by providing all counties of the State with authority to levy a one percent (1%) sales and use tax"); *id.* § 115C-501(a) (2017) (granting local taxing authorities the "authority to ascertain the will of the voters as to whether there shall be levied and collected a special tax in the several local school administrative units, districts, and other school areas . . . to supplement

the funds from State and county allotments"); *id.* § 115C-511(a) (2017) ("If a local school administrative unit or district has voted a tax to operate schools of a higher standard than that provided by State and county support," the board of county commissioners is authorized to levy a tax on all property located in the LEA to supplement the local current expense fund.).

Plaintiffs assert that Article IX, Section 2(2) and the statutes enacted pursuant to this constitutional provision make local entities responsible for providing a sound basic education. We disagree. As we noted in *Leandro I*, boards of county commissioners have a long history of involvement in local education, and this notion is ingrained in our State's educational structure:

> The idea that counties are to participate in funding their local school districts has a long history. In 1890, for example, Chief Justice Merriman wrote for this Court that: "the funds necessary for the support of public schools—the public school system—are not derived exclusively from the State. The Constitution plainly contemplates and intends that the several counties, as such, shall bear a material part of the burden of supplying such funds."

*Leandro I*, 346 N.C. at 349, 488 S.E.2d at 256 (quoting *City of Greensboro v. Hodgin*, 106 N.C. 182, 187-88, 11 S.E. 586, 588 (1890)). While the framers of our state constitution may have intended that Article IX, Section 2(2) *allow* for supplementing of school funding by boards of county commissioners, it clearly does not *require* the General Assembly to do so. The language utilized obviously is precatory, not mandatory. In examining the two pertinent constitutional provisions, we note the

importance of the framers' choice of "shall" in subsection (1) and "may" in subsection (2). "As used in statutes, the word 'shall' is generally imperative or mandatory." *State v. Johnson*, 298 N.C. 355, 361, 259 S.E.2d 752, 757 (1979) (citing *Black's Law Dictionary* 1541 (4th rev. ed. 1968)). In contrast, "may" is generally intended to convey that the power granted can be exercised in the actor's discretion, but the actor need not exercise that discretion at all.[5] *In re Hardy*, 294 N.C. 90, 97, 240 S.E.2d 367, 372 (1978) ("Ordinarily when the word 'may' is used in a statute, it will be construed as permissive and not mandatory." (first citing *Felton v. Felton*, 213 N.C. 194, 195 S.E. 533 (1938); and then citing *Rector v. Rector*, 186 N.C. 618, 120 S.E. 195 (1923))). If we assume, *arguendo*, that the General Assembly declined to exercise its Article IX, Section 2(2) discretion and assign financial responsibilities to the local boards of county commissioners or allow them to levy taxes for education, boards of county commissioners could not exercise *any* authority over local education. It is inapposite then to suggest, as plaintiffs have, that boards of county commissioners have some

---

[5] We do recognize that this Court occasionally reads the word "may" to carry the same meaning as "shall" when such an interpretation "will best express the legislative intent" and "it is employed in a statute to delegate a power, the exercise of which is important for the protection of public or private interests." *Puckett v. Sellars*, 235 N.C. 264, 268, 69 S.E.2d 497, 500 (1952); *see also Johnston v. Pate*, 95 N.C. 68, 71 (1886) (observing that "[t]he term 'may' is often construed as mandatory when the statute is intended to give relief" or "when a statute directs the doing of a thing for the sake of justice or the public good"). Here we see no reason to define "may" in the context of Article IX, Section 2(2) to be mandatory, as the provision was not intended to provide any party with relief or protect public or private rights or interests. Indeed, the purpose of the provision is to promote efficiency, as it gives the General Assembly a mechanism to supplement the costs and financial administration of the education system that it is required to set up and maintain.

inherent constitutional duty to provide a sound basic education, much less any other constitutional power related to education. If they did possess such inherent powers, then a situation like the one described above—in which the General Assembly has granted no financial responsibility to local units of government—would leave a board of county commissioners in the impossible situation of perpetually violating the constitution by not providing a sound basic education while lacking the means to do so.

Justice Story's ideas of constitutional construction from his seminal opinion in *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304 (1816), provide a useful analog. In *Hunter's Lessee* the United States Supreme Court was tasked with, *inter alia*, deciding whether it could hear a case on direct appeal from a state court without the case first passing through the lower federal courts. *Id.* at 323-24. The Court determined that it could. Recognizing that the Constitution stated that Congress "shall" (i.e., must) create a Supreme Court but merely "may" (i.e., can) create inferior courts, *id.* at 328, the Supreme Court reasoned that inferior courts need not be created at all. If Congress did not create inferior courts, the Supreme Court, whose "judicial power (which includes appellate power) shall extend to all cases," *id.* at 338, would naturally be able to hear cases on appeal directly from the states because the vested federal judicial power over the Constitution and laws of the United States would have to be exercised in some way and arise from somewhere, *id.* at 338-39. "Any other construction, upon this supposition," Justice Story wrote, "would involve

this strange contradiction, that a discretionary power vested in congress, and which they might rightfully omit to exercise, would defeat the absolute injunctions of the constitution in relation to the whole appellate power." *Id.* at 340. The same general reasoning may be applied to the case sub judice, as the General Assembly may refuse to grant any financial responsibility to local entities, thereby making it impossible for said local entities to carry out any education related duties, much less provide a sound basic education. This leaves the State, and the State alone, with the power to create and maintain a system of public education, which includes effectuating the right to a sound basic education. Just as "congress may lawfully omit to establish inferior courts, it might follow, that in some of the enumerated cases the judicial power could nowhere exist," *id.* at 330, the General Assembly may lawfully refuse to grant power concerning education to local governments, which, if plaintiffs' claims were correct, would create a situation in which a local government entity would have a constitutional duty to act without the means to do so. We cannot read our constitution to permit such a contradiction.

It has been suggested by both plaintiffs and the Court of Appeals dissent that the constitutional duty to provide a sound basic education is vested in or delegated to a unit of local government when the General Assembly enacts a law giving it financial responsibility concerning public education. This reasoning has been foreclosed by our decision in *Leandro II*. There we affirmed the order of the trial court which found that the State, "and by the State we mean the legislative and executive branches

which are constitutionally responsible for public education," was not providing a sound basic education to Hoke County students because it failed to ensure that available resources were being allocated appropriately. *Leandro II*, 358 N.C. at 635, 599 S.E.2d at 389. The State contended that it could not be exclusively responsible for providing the opportunity for a sound basic education because the Hoke County Board of Education was at least in part responsible for this failure to properly allocate resources and provide a sound basic education. *Id.* at 635, 599 S.E.2d at 389. We concluded otherwise, noting that the State was responsible for providing a sound basic education and "the trial court's ruling simply placed responsibility for the school board's actions on the entity—the State—that created the school board and that authorized the school board to act on the State's behalf." *Id.* at 635, 599 S.E.2d at 389.

The interrelationship between the State and local school boards discussed in *Leandro II* is comparable to that between the State and a county board of commissioners and is useful to our analysis in this case. In *Moore v. Board of Education,* 212 N.C. 499, 193 S.E. 732 (1937), this Court noted that local school boards are agencies of the State, with the General Assembly having close to plenary power over them. *Id.* at 502, 193 S.E. at 733-34 (stating that local governmental organizations, including school boards, "are intended to be instrumentalities and agencies employed to aid in the administration of the government" and "are the creatures of the legislative will and subject to its control, and such agencies can only

exercise such powers as may be conferred upon them and in the way and manner prescribed by law"). Like local school boards, counties and their respective boards of county commissioners also are "creatures of the General Assembly and serve as agents and instrumentalities of State government." *Stephenson v. Bartlett*, 355 N.C. 354, 364, 562 S.E.2d 377, 385 (2002). "[A] county's 'powers . . . both express and implied, are conferred by statutes, enacted from time to time by the General Assembly.' " *Lanvale Props., LLC v. County of Cabarrus*, 366 N.C. 142, 150, 731 S.E.2d 800, 807 (2012) (ellipsis in original) (quoting *Martin v. Board of Comm'rs of Wake Cty.*, 208 N.C. 354, 365, 180 S.E. 777, 783 (1935); *id.* at 150, 731 S.E.2d at 807 (stating that a county is "an instrumentality of the State, by means of which the State performs certain of its governmental functions within its territorial limits" (quoting *Martin*, 208 N.C. at 365, 180 S.E. at 783)). If, according to *Leandro II*, the General Assembly may not delegate or shift some of its responsibility to provide an opportunity for a sound basic education to a local school board, an agency of the State, then it follows that the General Assembly also may not pass this same responsibility on to a county board of commissioners, also an agency of the State. The trial court's order at issue in *Leandro II* found "that the *State bore ultimate responsibility* for the actions and/or inactions of the local school board, and that it was the State that must act to correct those actions and/or inactions of the school board that fail to provide a *Leandro*-conforming educational opportunity," and we upheld this determination. 358 N.C. at 635, 599 S.E.2d at 389 (emphasis added). Following this reasoning, any

complications born of the incompetence or obstinance of a county board of county commissioners relating to the finances of local education are the "ultimate responsibility" of the State, which must step in and ameliorate the errors.[6]

Plaintiffs have expressed concern that a determination that only the State is responsible for providing children the opportunity to receive a sound basic education will give local governments the ability to disregard their obligations relating to education by allowing them to refuse to provide funds for, among other things, books,

---

[6] Defendant argues that our decision in *King v. Beaufort County Board of Education*, 364 N.C. 368, 704 S.E.2d 259 (2010), is irreconcilable with our holding today. In *King* we held that a student who is suspended and denied access to alternative education must be given a reason why he or she is not allowed to participate in an alternative education program. *Id.* at 370, 704 S.E.2d at 260-61. Plaintiffs assert that because the local school board in *King* was the only proper defendant in the litigation, a local entity may be responsible for providing a sound basic education to students. We disagree, as *King* does not stand for such a broad proposition. Notwithstanding our decision in *Leandro II*, in which we noted that the State may not delegate its overall responsibility of providing a sound basic education to local school boards, *King* is not controlling here and may be distinguished from the *Leandro* decisions and the present case.

   *King* is, primarily, a decision regarding school discipline, based upon statutes enacted by the General Assembly which require LEAs to offer at least one alternative education program and create strategies for assigning long-term suspended students to it when feasible and appropriate. *King* clearly expressed that there is no fundamental right to an alternative education. 364 N.C. at 372, 704 S.E.2d at 261 ("In acknowledging a statutory right to alternative education, we stress that a fundamental right to alternative education does not exist under the state constitution."). The State, in its discretion and outside the *Leandro* mandate that requires it to provide every child an opportunity for a sound basic education, has chosen to provide for the continued schooling of children who have misbehaved and been removed from the schoolhouse. *King* was not concerned with the local board of education providing a sound basic education to its students but rather with how the statutorily created right to receive an alternative education was to be preserved. As such, we held that "*insofar as the General Assembly has provided a statutory right* to alternative education, a suspended student excluded from alternative education has a state constitutional right to know the reason for her exclusion." *Id.* at 372, 704 S.E.2d at 261 (emphasis added).

equipment, school transportation, and maintenance or construction of school facilities. In effect, plaintiffs say county governments would thus be allowed to abandon their fiscal responsibility regarding education with impunity and pass their alleged constitutional duties along to the State. This is not the case. Plaintiffs' line of reasoning is arguably sound only if one presupposes that counties have such constitutional duties in the first place, and we have determined that they do not. Furthermore, irrespective of a county's constitutional powers relating to education, no entity is free to ignore the mandates of the General Assembly. Nothing in this opinion should be read to suggest that a county board of commissioners, or any other local entity with duties imposed by General Assembly enactments, may ignore statutory requirements laid out by the legislature. Furthermore, to the extent that a county, as an agency of the State, hinders the opportunity for children to receive a sound basic education, it is the State's constitutional burden to take corrective action.

It is important to note that the legislature has provided statutory relief from inadequate funding in an LEA if a local board of education determines that the funds appropriated to it by the county board of commissioners are "not sufficient to support a system of free public schools." N.C.G.S. § 115C-431 (2017) (titled "Procedure for resolution of dispute between board of education and board of county commissioners."). This process involves the chairs of both the local board of education and the board of county commissioners jointly meeting with a mediator to "make a good-faith attempt to resolve the differences that have arisen between them," but if

they cannot and a subsequent attempt at mediation fails, the local board of education may file an action in superior court where a jury may decide the appropriate budget for the school year. *Id.* § 115C-431(a)-(c). Plaintiffs note that there is no similar statutory action against boards of county commissioners available to parents or students seeking to vindicate their right to a sound basic education. If a local school board chooses not to pursue a section 115C-431 action, plaintiffs contend that relief from the courts is the only manner by which they may vindicate their right to a sound basic education as it pertains to county funding of local schools. Again, plaintiffs' claim is untenable because it assumes that a county board of commissioners has some constitutional duty to provide a sound basic education in the first instance. As we concluded above, county boards of commissioners have no such duty, so plaintiffs are precluded from asserting constitutional claims against them concerning this specific constitutional right.

If a section 115C-431 course of action is deficient, as plaintiffs have suggested, parents and students are still free to assert a child's constitutional right to receive a sound basic education directly against the State. The Court of Appeals suggested this very remedy, opining that the correct avenue for relief in this case would be for plaintiffs to raise the issues alleged in their complaint with the superior court overseeing the ongoing *Leandro* litigation, *Silver*, ___ N.C. App. at ___, 805 S.E.2d at 329-30, but plaintiffs contend that this, too, is inadequate. Plaintiffs maintain that this Court's decisions in the *Leandro* cases are concerned with the scope of the right

to a sound basic education and whether the amount and spending of resources provided by the State properly guarantee this right. Plaintiffs further claim that intervention in the *Leandro* case is procedurally impractical because that litigation has been in a remedial phase for nearly fifteen years and no substantive rulings have issued in *Leandro* aside from a decision pertaining to pre-kindergarten programs in 2011. Regardless of the feasibility of intervention in the *Leandro* litigation, plaintiffs have not advanced any reason—and we can find none—why they cannot bring an action directly against the State in order to cure the alleged constitutional violations.

In *Leandro II* we noted that "[t]he children of North Carolina are our state's most valuable renewable resource. If inordinate numbers of [students] are wrongfully being denied their constitutional right to the opportunity for a sound basic education, our state courts cannot risk further and continued damage because the perfect civil action has proved elusive." *Leandro II*, 358 N.C. at 616, 599 S.E.2d at 377. This Court's statement in *Leandro II* remains true today. However, here, we are not confronted by a civil action that is merely imperfect, but rather we have been presented with an action that must fail because plaintiffs simply cannot obtain their preferred remedy against this particular defendant on the basis of the claim that they have attempted to assert in this case. The allegations in plaintiffs' complaint, if true, are precisely the type of harm *Leandro I* and its progeny are intended to address. In keeping with *Leandro*, however, the duty to remedy these harms rests with the State, and the State alone. Accordingly, we affirm the decision of the Court of Appeals that

affirmed the trial court's order dismissing the action for failure to state a claim upon which relief can be granted.

AFFIRMED.